THIRD NATIONAL BANK OF ST. LOUIS, Appellant, v. ST. CHARLES SAVINGS BANK, Appellant.

**In Banc, July 2, 1912.**

1. **BILL OF EXCEPTIONS: Signed by Special Judge at Next Term: Incidental Power.** Wherever a power has been granted by statute, the grant of such power carries with it, by necessary implication, everything to make such grant effectual. So that where the regular judge was sick, and, acting under Sec. 1909, R. S. 1909, he requested the regular judge of another circuit to hold the term of court, with which request such judge complied and rendered judgment, such called-in judge has power at the next term to settle and approve the bill of exceptions, although the regular judge is then present and holding court. The signing of the bill was a mere incident to the main power granted to such other judge to hold court for his sick brother.

2. ———: ———: **Common Bill: Common Fault.** And that being the case, it is not necessary to decide that, where both sides appeal, and the common bill of exceptions was signed by the special judge at the request of both, neither can be heard to say that error was committed in getting the wrong judge to sign it, but a ruling on that point is reserved for a case in which those facts will be decisive.

3. **TESTIMONY: Competency: Different Counts and Issues.** Where there is more than one count in the petition, raising different issues or stating different causes of action, testimony is competent if it tends to sustain any one of them, though it may be incompetent as to a single one.

4. ———: ———: Consideration for Guaranty: Explained by
Parol. The consideration clause of a guaranty contract is in
the nature of a receipt and is open to explanation by parol.
And especially should such parol testimony be admitted if the
contract does not purport to name all the consideration, but
contains the clause "and other valuable considerations to them
moving."

5. ———: ———: ———: Varying Written Instrument: Suit on
Written Guaranty. But parol proof is not admissible to alter
or vary a written contract, by enlarging or diminishing its
terms, or to create a different relation between the parties
from that prescribed by the instrument itself. In a suit on
an unequivocal written contract, a party must stand on its
terms. And hence where plaintiff sued a bank on its written
guaranty of a note, verbal testimony tending to show a verbal
agreement to make the loan to the bank and not to the maker
is incompetent in so far as it swayed the mind of the court
and led up to a judgment on the count of the petition count-
ing on the bank as guarantor.
Held, by WOODSON, J., dissenting, that the whole of the con-
     tract was evidenced by a note upon which the money was
     obtained, a collateral agreement pledging certain securi-
     ties of the maker for the payment of that note, and a
     written guaranty by which defendant bank obligated itself
     to pay the note, and as all of them are unequivocal and
     certain in terms, no parol testimony is competent to vary
     those terms, and no parol testimony which tends to change
     the cause of action from one on the guaranty to one for
     money had and received is competent; and as plaintiff
     cannot recover on the guaranty, and without such parol
     evidence could not recover on the count for money had
     and received, it cannot recover at all. Where parties have
     put their contracts in writing they cannot, by changing
     their form of action, put aside the written contract, vary
     its terms, or add to or subtract from them, by parol evi-
     dence.

6. ———: ———: Cashier of Bank: Conversations with Lender.
In the absence of a statute, the cashier of a bank is held out
to the public as having authority to act according to the gen-
eral usage, practice and course of business of such institu-
tions. Hence conversations between the cashier of a bank and
the plaintiff at the time plaintiff was induced to lend to a
third person a large sum of money, whose payment the cashier
in the name of the bank in writing guaranteed, was not in-
competent evidence on the theory that the cashier was outside
his duties to his bank and was pursuing his own personal
affairs. Such testimony was competent to sustain either the

Bank v. Bank.

count relating to the guaranty, or the count counting on money had and received.

7. **GUARANTY: Money Had and Received: Recovery.** Plaintiff can have only one recovery where all the counts in his petition relate to one transaction. If he is entitled to recover against defendant as guarantor of notes executed by a borrower of plaintiff, he cannot also have judgment for money had and received.

8. ————: **Power of Bank Cashier.** The cashier of a bank has no authority, without express prior authority from its board of directors, to obligate the bank to guarantee the payment of a note made by a third party for a loan made to such third party; and when suit is brought by the payee of the note, on said written guaranty, made in the name of the bank by its cashier, who had no express authority from its board of directors to obligate the bank as guarantor, and no authority to do so other than what inheres in his office as cashier, a judgment for said payee cannot stand.

. 9. **MONEY HAD AND RECEIVED: General Principle.** It is a fundamental principle that he should have satisfaction who sustained the loss, and he should make satisfaction who obtained the benefit. The action for money had and received lies where defendant has received or obtained money of plaintiff which, in equity and good conscience, he ought to pay over to plaintiff.

10. ————: **Form of Action.** The action for money had and received, though an action at law, is so favored by courts, and is so flexible in form and relief, that it levies tribute indifferently on equitable, as well as strictly legal, principles.

11. ————: **Where Things are Treated as Money.** The action for money had and received not only lies where defendant has obtained plaintiff's money, but it goes further and lies for things treated as money, and when such is the case the count bottomed thereon may be supported by evidence of defendant's receipt of bank notes, promissory notes or credit on account in the books of a third person.

12. ————: ————: **Borrowing Money In Name of Another.** Where defendant bank, through its cashier, using a third party as a dummy, borrowed money from plaintiff bank for the purpose of stiffening its reserve, and received the money, the defendant is liable for money had and received, though the note evidencing the loan was signed by the dummy alone, and though defendant bank through the form of a written guaranty, signed by the cashier in its name without authority, guaranteed the payment of the note. In such case justice disregards the mere evidentiary shell or form adopted

by the cashier, and sees him as the cashier of the defendant bank initiating, shaping and hovering over the transaction and using the broken dummy and his worthless collaterals, pledged at the cashier's request as security for the note, as a mere man of straw; sees the defendant bank, at the direction of the cashier, receive a credit on the lender's books for the proceeds of the loan; sees the invalid guaranty on the strength of which the loan was made; sees the cashier take negotiable certificates of a time deposit in favor of the defendant bank for the amount of the credit and place them in defendant's bank, and sees defendant indorse them and negotiate them before due and collect them from plaintiff through another bank.

*Held,* by WOODSON, J., dissenting, that the facts were that the cashier of the defendant bank did not borrow the money from plaintiff bank for himself or for his bank, but only undertook for his bank to guarantee the loan made to said dummy, who signed the note for the amount and secured it by his own collateral and permitted the certificates of deposit to be issued to defendant bank in payment to that extent of his indebtedness to defendant, and received therefor from defendant drafts drawn on defendant for the amount and paid by another bank, and hence defendant is liable on the unauthorized guaranty or not at all, and can no more be held for money had and received than it could be if the said maker of the note had paid the money received thereon to some other of his creditors.

*Held,* also, that a suit for money had and received is not one in equity, and the contract sued and relied upon being one of guaranty that contract cannot be reformed, except in a special suit for that purpose, and the suit being not one of that character equity cannot look beyond the mere form of the transaction and deal with its substance and by so doing see the defendant bank as the real borrower.

13. ———: ———: ———: **Reimbursing Said Other: Notice.** And under such circumstances the fact that after the time certificates in favor of defendant bank were in its possession, its cashier gave to the dummy drafts for the amount of the loan drawn on defendant's correspondent or depository and when returned to defendant as paid were not allowed to appear on its books but were concealed by the cashier, being at best only evidence of debt and that course being brought about by no agreement, is of no significance. Besides, if the cashier, as the defendant's cashier, cashed those drafts originally in behalf of defendant in the usual course of banking, the defendant had notice of their worthlessness and of all facts lying back of them; and likewise, if defendant now adopts the cashier's act in handing over those worthless drafts, then notice to him as cashier is notice to the bank.

14. **BANKING: Notice.**  Notice  to  the  cashier  transacting  the business of a bank is notice to the bank.

15. **MONEY HAD .AND RECEIVED: Voluntary Payment.**  Where the plaintiff bank loaned money to defendant bank, and the loan was evidenced by a note signed by a straw man and its payment was guaranteed by defendant bank, and plaintiff issued negotiable time certificates to defendant for the amount of the proceeds of the loan, and before those certificates were due, indorsed and 'sent them to another bank, which presented them to plaintiff for payment and which on being requested to state what relation it sustained to them and how it held them refused to answer, and plaintiff then knew that defendant disclaimed liability and being advised by its attorney that the certificates were negotiable, a payment thereof by plaintiff is not voluntary, and plaintiff, by paying them, is not barred from recovering the amount thereof as for money had and received.

16. ——————: **Entitled to Recover: Judgment for Same Amount on Guaranty Count: Different Rate of Interest: Reversal.**  Where plaintiff's petition contained two counts, one on a written guaranty, and· the other for money had and received growing out of the same transaction, and it is held that there can be no recovery on the first, but may be on the second, but the guaranty calls for eight per cent interest and that was allowed, judgment cannot be entered on the second count in the appellate court, but the cause must be reversed with directions to enter judgment for the amount of money received, deducting payments made, and calculating the interest from date of suit at six per cent.

Appeal from Boone Circuit Court.—*Hon. Nick M. Bradley,* Special Judge.

REVERSED AND REMANDED (*with directions*).

*Eugene H. Angert* and *E. W. Hinton* for plaintiff-appellant.

(1) The finding for the plaintiffs on the special count was proper, because the defendant ratified and adopted the unauthorized guaranty ·by collecting, retaining and appropriating the proceeds of the certificates of deposits issued to it by plaintiff, after full knowledge that such certificates had been obtained on

the strength, and by means of the guaranty. (a) The defendant bank had the corporate power to raise money, either by direct borrowing, or by endorsing or guaranteeing the note of a third person. Lyons v. Bank, 220 Mo. 538; Donnell v. Bank, 80 Mo. 165; Bank v. Bank, 101 U. S. 181; Bank v. Bank, 109 N. W. 61; Autin v. Bank, 174 U. S. 125. (b) The transaction in question was, in fact and in effect, a raising or borrowing of money by means of a guaranty, because it originated in an agreement for a loan to defendant, and was consummated by the issuance of the certificates of deposit directly to defendant on the faith of the guaranty executed on its behalf for the payment of a straw note. (c) Since a bank is probably without power to bind itself by an accommodation indorsement or guaranty, it was therefore competent and proper for the plaintiff to prove the consideration and purpose of the guaranty, namely, the loan or advance of money to defendant. Donnell v. Bank, 80 Mo. 165; Bank v. Bank, 109 Mo. 61; Liebke v. Knapp, 79 Mo. 22. (d) Since the defendant could have authorized the execution of the guaranty in the first instance, it had the power to ratify and adopt the guaranty which Mispagel assumed to execute on its behalf. Bank v. Bank, 101 U. S. 181; Bank v. Bank, 109 N. W. 61; Donnell v. Bank, 80 Mo. 165; Hume v. Eagon, 73 Mo. App. 271; Swofford v. Bank, 81 Mo. App. 46. (e) The defendant did ratify the guaranty by collecting and appropriating thereof after full knowledge of the whole transaction. Bank v. Bank, 101 U. S. 181; Bank v. Bank, 109 N. W. 61; Bank v. Trust Co., 187 Mo. 494; Donnell v. Bank, 80 Mo. 165; Bank v. Bank, 107 Mo. 133; Bank v. Fricke, 75 Mo. 178; Hume v. Eagon, 73 Mo. App. 271; Swofford v. Bank, 81 Mo. App. 46. (f) And the previous refusal to ratify, or the repudiation of the contract, did not destroy the subsequent acts of adoption. Hatch v. Taylor, 10 N. H. 538; Haney v. Baptist Inst., 113 Ga. 289; Fleishman v. Verdoes, 111 Ia. 322. (2)

If the defendant can escape liability on the written contract, because not formally authorized, then the written contract is out of the way, and the plaintiff is entitled to recover on the count for money loaned. Bank v. Lyons, 220 Mo. 538. (3) In any event the plaintiff is entitled to recover on the count for money had and received, because it stands admitted that defendant collected $20,000 of the plaintiff's money, for which the plaintiff has received no consideration, if the guaranty fails. Bank v. Lyons, 220 Mo. 538; Appleton v. Bank, 190 N. Y. 417; Bank v. Appleton, 216 U. S. 196; Aldrich v. Bank, 176 U. S. 341.

*W. M. Williams, Theodore C. Bruere, F. G. Harris,* and *C. W. Wilson* for defendant-appellant.

(1) Judge Bradley held the term of the Boone Circuit Court at which this case was tried, and he signed the bill of exceptions. He was the proper person to sign said bill, which was merely completing the record of the term held by him. State v. Bobbitt, 215 Mo. 30; State v. Gordon, 196 Mo. 195; Sec. 3960, R. S. 1909; Patterson v. Yancy, 97 Mo. App. 687; Bener v. Daniel, 198 Mo. 315; State v. Morris, 230 Mo. 631. (2) The trial court erred in permitting the plaintiff's witnesses, Galbreath and Huttig, to testify to the conversations and understandings between them and Mispagel, at the time he and Baird applied for the loan. (a) Because the contract made between the parties and sued on in this case, was at the time reduced to writing. Oral testimony was not admissible to alter, vary, explain, or enlarge the written contract that was finally made. Bank v. Terry, 67 Mo. App. 16; Helmrichs v. Gehrke, 56 Mo. 79; Tracy v. Iron Works, 104 Mo. 198; Morgan v. Porter, 98 Mo. 140; Construction Co. v. Tie Co., 186 Mo. 61; Meredith v. Holmes, 105 Mo. App. 352; Reigalt v. Coal & Coke Co., 217 Mo. 160; Boyd v. Paul, 125 Mo. 9; Squier v.

Evans, 127 Mo. 518; Harrington v. Brockman Co., 107 Mo. App. 418; Bank v. Bayless, 35 Mo. 428, 41 Mo. 274. (b) Because in this transaction the defendant's cashier, Mispagel, was not acting within his powers and duties as cashier, and consequently his statements and representations were not binding upon the defendant. For while the statements and representations made by a cashier in the ordinary course of business are binding upon his bank, yet when he engaged in matters that are outside his duties and beyond his powers, his representations and statements do not bind his principal. Bank v. Froman, 129 Mo. 430; Bank v. Lovitt, 114 Mo. 519; Bank v. Shaumberg, 38 Mo. 228; Benton v. Bank, 122 Mo. 339; Fraber v. Hicks, 131 Mo. 192; Hickman v. Green, 123 Mo. 176; Windsor v. Bank, 18 Mo. App. 674; Smith v. Boyd, 162 Mo. 157; Keyser v. Hinkle, 127 Mo. App. 73. (3) The trial court erred in refusing defendant's instruction directing a finding against the plaintiff and in favor of the defendant on the first count of plaintiff's petition. (a) Because the alleged guaranty contract executed by Mispagel to plaintiff was illegal and void, being made in violation of the provisions of an express statute, enacted for the government of bank cashiers and other bank officers, which plainly prohibits any officer of a bank from contracting such obligations, except in obedience to an order of the board of directors. Sprague v. Rooney, 104 Mo. 358; Board of Trade v. Brady, 78 Mo. App. 585; R. S. 1909, secs. 1099, 1112; Bank v. Hughes, 62 Mo. App. 581; Chew v. Ellingwood, 86 Mo. 260; Savings Assn. v. Sailer, 63 Mo. 24; Hume v. Eagan, 83 Mo. App. 576; Vansandt v. Hobbs, 84 Mo. App. 628; Bacon, Dawson & Co. v. Bank, 79 Mo. App. 406; Powers v. Woolfolk, 132 Mo. App. 362; Dowing v. Reïper, 7 Mo. 585; Rothwell v. Gibson, 121 Mo. App. 279. (b) Because the plaintiff knew that Mispagel in executing the guaranty contract was act-

ing without authority and outside of his legitimate powers. It is presumed to know the law. Bank v. Lyons, 220 Mo. 577. (c) Because at the time of the execution of said guaranty, October 13, 1904, the plaintiff parted with no money on the faith of it. The evidence is conclusive—all one way—that the plaintiff paid out no money in this matter until November 30, 1904, almost two months after the execution of the papers sued on. In the meantime plaintiff was fully advised that the defendant repudiated and refused to ratify Mispagel's action in executing the guaranty contract, and at the same time insisted that plaintiff should pay the time certificates it had issued on October 13. Plaintiff paid the money with a full knowledge of the facts and cannot recover back money so paid. State ex rel. v. Stonestreet, 92 Mo. App. 220; Brewing Co. v. St. Louis, 187 Mo. 376; Claflin v. McDonough, 33 Mo. 416; Wolfe v. Marshall, 52 Mo. 167. (4) The judgment of the trial court was upon the first count of the petition, which is a suit upon a guaranty executed by defendant's cashier, without the authority of its board of directors, of a note executed to the plaintiff by Baird. The cashier had no authority to execute the guaranty in behalf of the defendant bank, and the bank is not bound thereby. R. S. 1909, sec. 1099; Bacon, Dawson & Co. v. Bank, 79 Mo. App. 406; Tiedeman on Commercial Paper, sec. 116; 1 Am. and Eng. Ency. Law (2 Ed.), 348; Morse on Banks and Banking (3 Ed.), sec. 65; 5 Cyc. 523; Bank v. Seymour, 72 N. W. 724. (5) A bank cannot make an accommodation indorsement, notwithstanding "the party accommodated uses the money borrowed, as here, for the payment of a demand which the accommodation indorser holds against the party for whose benefit the pretended promise is made." Bacon, Dawson & Co. v. Bank, 79 Mo. App. 411; 7 Am. and Eng. Ency. Law (2 Ed.), 489; Davis v. Railroad, 41 Am. Rep. 221. (6) The acceptance of the

certificates of deposit and the collection thereof by the defendant bank was not a ratification of the guaranty executed by the cashier without authority. The loan was made by the plaintiff bank to Baird, and the certificates of deposit were received and collected as a payment on his debt to the defendant, with express notice to plaintiff that defendant denied liability on the guaranty. Bacon, Dawson & Co. v. Bank, 79 Mo. App. 406; Bank v. Seymour, 73 N. W. 724. (7) The note and guaranty upon their face showed that Baird was the principal debtor and the bank a mere guarantor. The writings established this relationship between the parties, and it was incompetent to attempt, by parol evidence, to change the same. Wood v. Motley, 83 Mo. App. 97; Bank v. Terry, 67 Mo. App. 17; Bank v. Wells, 98 Mo. App. 581. (8) Defendant cannot be held for money loaned to it under the second count of the petition. (a) The money was borrowed by Baird, and plaintiff bank was notified at the time that the purpose was to reduce Baird's indebtedness to defendant. This could not have been accomplished by a loan to the defendant. An action for money lent cannot be maintained upon a collateral undertaking to guarantee advances to be to a third person. 27 Cyc. 827; Douglan v. Reynolds, 7 Peters (U. S.) 113. (b) The guaranty is an independent collateral agreement and the guarantor is not the maker of the note. Tiedeman on Commercial Paper, 415. (9) Defendant cannot be held on the third count for money had and received and the judgment was properly rendered in its favor upon that count of the petition. Otis v. Stockton, 76 Me. 506; Stephens v. Board of Education, 79 N. Y. 183; 27 Cyc. 849. (10) The judgment of the trial court on the first count of the petition is clearly erroneous, and must be reversed. If the court does not agree with us that the judgment should simply be reversed, we insist that the judgment should be reversed and the cause remanded for retrial on the

common counts. The defendant is at least entitled to have the issue submitted to the triers of the facts on the common counts. The trial court having found in favor of the defendant on the common counts, this court ought not to usurp the functions of the jury and arbitrarily direct a verdict on the count for money had and received.

LAMM, J.—This is a suit with a petition in three counts—one on defendant's guaranty of a promissory note; the other two were common counts for money loaned, and money had and received—all relating to the same transaction. On an answer denying the authority of its cashier to execute the guaranty, and in a trial without the aid of a jury in the Boone Circuit Court, plaintiff recovered on the first count, $24,722.75, and the finding was for defendant on the second and third. On due steps by both litigants, with a common bill of exceptions and abstract of record, there are cross-appeals.

Plaintiff is a national bank in St. Louis, defendant a State bank at St. Charles. Since 1901, and up to October, 1904, plaintiff was (what is known among bankers) a "correspondent" of defendant in St. Louis. Between the two there was a run of business and plaintiff generally carried a deposit for defendant, called in the record, an "inactive" account, i. e., one not generally checked against. Defendant had another correspondent in St. Louis, the American Exchange Bank, where it kept an "active" account. For many years prior to October, 1904, one A. F. Mispagel was cashier and chief executive officer of defendant, on its behalf transacting all business with plaintiff.

On October 13, 1904, plaintiff, under circumstances presently presented, issued to defendant three time certificates of deposit, in their nature negotiable, each for $10,000, drawing three per cent interest from date

and payable ten days after demand. These were delivered directly to Mispagel on behalf of defendant by plaintiff and were carried by him to St. Charles, were found in defendant bank, were finally indorsed by defendant over to the American Exchange Bank, demand of payment was made by the latter on November 21, 1904, and they were paid by plaintiff to the latter, as holder, and taken up in the usual course of business through the St. Louis clearing house nine days later. We will recur to this payment later. One of these certificates represented the proceeds of a check drawn by Mispagel on October 13, 1904, on the American Exchange Bank, transferring to plaintiff $10,000 from the account of defendant at that bank. The other two represented the discount of a note for $20,000. According to the *form* of this note, one W. J. Baird was maker and defendant was guarantor. Baird lived in St. Charles, as did Mispagel. He was a stranger at plaintiff bank, while Mispagel was well known there. Baird was in the "grain" line. We infer, in puts and calls on the grain market, that is, betting on the future price of grain. We infer, also, that Mispagel was jointly interested in some of these deals. The result was that he, through Baird and otherwise, misappropriated a great deal of defendant's money, and said misappropriations were covered up by false bookkeeping and similar knavish tricks coming to light a month or so after said time certificates were issued. We shall recur to those defalcations later and to Baird's apparent connection therewith.

Attending more closely to the events of October 13, 1904, on pretense that defendant's reserves needed stiffening against an unexpected bank examination, on that day Mispagel (taking Baird along) appeared at plaintiff's banking house and, under circumstances presently set forth, Mispagel entered into negotiations with plaintiff's officers resulting in Baird's executing to plaintiff a promissory note of $20,000 (the one

above referred to) due in ninety days, interest at eight per cent from maturity, payable at plaintiff's banking house in St. Louis. To that note was attached a collateral contract in usual form, signed by Baird, pledging two certain notes to secure the principal note, one for $5000 in which Baird was payor and said Mispagel was payee, dated October 1, 1904, due in ninety days and indorsed by said Mispagel and one Connery. The other collateral note was for $10,000 due in six months, and bore the same date as the first. In that, Baird was also payor and Mispagel payee. It was indorsed by the latter, and purported to be secured by a deed of trust, and certain shares of stock in a commission company and in a milling company. While a few hundred dollars were eventually made out of the deed of trust and credited on the principal note, the testimony shows the collaterals were practically worthless at the time of the pledge, and were then recognized and spoken of by plaintiff's officers as worthless when pledged. So, the indorsers of those collateral notes, with Baird, were insolvent on that date and up to the time of the trial. It is further shown that the principal note was discounted by plaintiff on the credit and strength of defendant's guaranty alone. That guaranty was executed by defendant's cashier at the same time as the Baird note and, among other narrations, recites as follows:

"Now for value received and in consideration of one dollar paid to the undersigned, receipt of which is hereby acknowledged, and in consideration of the discount of said note, by said bank, *and other valuable consideration to them moving* the St. Charles Savings Bank for themselves, their successors or assigns, hereby guarantees to the Third National Bank of St. Louis, Mo., its successors or assigns, the prompt payment of the aforesaid note, as well as any renewals thereof. Whenever said note, or renewals thereof, shall become due and remain unpaid, the undersigned will, on de-

mand and without notice of dishonor or protest, pay the amount due thereon to said Third National Bank of St. Louis, its successors or assigns, and it shall not be necessary for said bank in order to enforce payment, to first institute suit or exhaust its remedies against the other parties liable on said note.

"St. Charles Savings Bank,<br>"per A. F. Mispagel, Cashier."

The first interview on said October 13, was between Mispagel and Mr. Galbreath, cashier of plaintiff, at noon while plaintiff's president was at lunch. Mispagel told Galbreath that his bank was carrying too much of Baird's paper and wanted to get $20,000 of it out and build up its reserve to a like amount against an expected bank examination. Galbreath it seems took a memorandum of the proposition including data regarding offered collaterals. He told Mispagel that he (Galbreath) had no authority to make loans and Mispagel must see Mr. Huttig, president of plaintiff, who had such authority. Mispagel told Galbreath that his (Mispagel's) bank didn't need funds but that its object was as stated, and, as an additional inducement, he offered to draw a check as defendant's cashier for $10,000 on the American Exchange Bank, making $30,000 to leave as a deposit with plaintiff as the result of that transaction if plaintiff would make the loan. At this stage of the affair Mispagel and Baird left the bank. Returning presently Mispagel saw Mr. Huttig and told him, as he had Galbreath, that he wanted to negotiate a $20,000 loan for Baird. It seems Galbreath had already talked to Huttig before that conversation and Huttig had a sketch of the proposition. Huttig refused to make the loan to Baird, telling Mispagel that plaintiff would not loan to any but customers, but he would be glad to accommodate defendant bank, a customer, and loan the money to it. Thereat Mispagel said he would take the loan for

his bank. Thereupon Huttig took Mispagel over to Galbreath's desk and told him he had made a loan to the St. Charles Savings Bank for $20,000. He left the matter with the cashier to attend to and left the two together to arrange details, himself going away to take no further hand in it. Galbreath asked Mispagel in what form he wanted the loan drawn up. Mispagel said he wanted plaintiff to take Baird's note secured by collaterals, which he had in his pocket, the note to be guaranteed by defendant bank. Galbreath did not want the collaterals, and said to Mispagel the guaranty of the bank would be sufficient without them. Mispagel insisted on the collaterals going in and that form was adopted to effectuate the loan and carry out Huttig's instructions. Mispagel was turned over to Mr. Cooke, another officer, whose duty it was to draft such papers. He drafted them, telling them, according to Baird's version, the collaterals were of no account. After the papers were executed the proceeds of the note were credited to defendant, Mispagel drew his cashier's check for $10,000 on the American Exchange Bank, as said, and plaintiff then caused to be executed to defendant the three time certificates mentioned, representing that check and the proceeds of the note, and delivered them to Mispagel. It is not clear that Baird was present during all or most of these negotiations. At any rate he took no part in them of his own initiative. Mispagel was the spokesman, and outside of signing the note and attending to some details Baird did nothing and said nothing. He seems to have been clay in the potter's hands—the potter being Mispagel. Adding the $10,000 check to the proceeds of the discount of the note and the account defendant then had with plaintiff, there was left standing to defendant's credit with plaintiff about $60,000 on that day when this transaction was over, against which the three time certificates were outstanding.

Going back a little: At a certain time before the things happened we have been narrating, at a date dark, the directors of defendant bank got the notion they had too much idle money in their St. Louis depositories. They hit on the plan of having some of it put on time deposit in order to draw a larger rate of interest than was allowed on daily balances. Accordingly they instructed Mispagel orally to see to it that the thing was done. There was no record to that effect on the bank's minute books, but there was testimony that a consultation was had, with the result mentioned. Ostensibly carrying out that plan, Mispagel caused a stub on the draft or check book used in checking on the American Exchange Bank to show a check in favor of plaintiff, drawn on October 14, 1904, for $30,000. As said the real check was for $10,000 and dated October 13, and the lying stub spoke of one for $30,000. At or about that date, we infer, there appeared in the bank the three time certificates issued by plaintiff, which would indicate to the other officers if they saw them that Mispagel had carried out his instructions to make a time deposit for $30,000.

We come now to speak of the apparent connection of Baird with at least some of Mispagel's misappropriations of his bank's funds. It seems, as near as can be seen from the dim record, that the plan of Mispagel and Baird was to have Baird draw drafts signed by him and the Connery Commission Company, which drafts by some form of manipulation by indorsement or order, were to be and were paid by defendant's depository in St. Louis. When these drafts were returned to defendant as paid they were not allowed to appear on the books of defendant, but were taken out by Mispagel. The record is not as clear as it might be on the details, but the result was that defendant's books showed a very much greater volume of deposits in St. Louis to the credit of defendant than actually existed, and this fact may have led up to the directors'

plan of putting some of it out on time. We do not understand that the bank books showed these dealings with Baird, or any overdraft of his or that he owed the bank anything—the data evidencing those facts being carried by Mispagel in his vest pocket, so to speak, and came to the surface later. At some time after the 13th of October, 1904, at a date uncertain, Mispagel took out of his pocket four of these worthless Baird drafts, each for $5000, and handed them over to Baird. Baird at that time, as said, was insolvent, and when on the witness stand for defendant he stated that the consideration for the surrender of these drafts was the collateral he had put up at plaintiff bank on the $20,000 loan. At that time defendant bank had cashed for Baird about $60,000 of the same sort of drafts. These drafts were also signed by the Connery Commission Company, but Mispagel knew at the time that the commission company was insolvent and that Baird was insolvent. Mispagel also was insolvent, and Baird knew that fact. There is not a scintilla of evidence that the arrangement for surrendering the four drafts to Baird was made prior to the negotiation of the $20,000 note to plaintiff. It may or may not have been an afterthought.

The last of October or the first of November, 1904, the crookedness of Mispagel came to light and was bruited. Thereupon plaintiff, hearing thereof the next day, sent its assistant cashier, Arnold, to St. Charles, to get the indorsement of Mr. Bruere, president of defendant bank, upon the $20,000 note. Mr. Arnold's version of the conversation with Mr. Bruere (now dead) differs somewhat from that of the president's son who was present. According to Arnold he informed the president of defendant bank, Bruere, Sr., that plaintiff was carrying the $20,000 Baird note on account of defendant and that two of the three certificates of deposit of $10,000 each, held by defendant and issued by plaintiff, represented the proceeds of

said $20,000 loan made by Mispagel as defendant's cashier. Arnold conveyed to defendant's president the wish of the directors of plaintiff to have the indorsement of Mr. Bruere, in addition to the bank's guaranty, in order to make the note absolutely good. Bruere refused to make the indorsement and told Arnold that "an examination of Mispagel's accounts had not been fully made, and that he did not know whether the St. Charles Savings Bank had received the proceeds of the note." The son of Mr. Bruere, now president of defendant, gave the following version of that conversation: Arnold wanted the board of directors of defendant to ratify the action of Mispagel in executing the guaranty. Witness looked over the guaranty which Arnold presented and Arnold was told it was null and void, was prohibited by the statutes unless authorized by the board of directors; that such authority had not been given; that defendant bank knew nothing about the transaction, and if plaintiff loaned Baird any money it was its own lookout, and defendant would not ratify Mispagel's act in executing the guaranty. Up to that time, said this witness, defendant knew nothing about the Baird note. The witness admitted that Arnold said that one of the time certificates represented the proceeds of the $10,000 check on the American Exchange Bank and that the other two were received by defendant on the Baird transaction. The upshot of this witness's version was that Arnold was told that defendant bank had nothing to do with it, that plaintiff would have to look to Baird for payment, and that defendant expected plaintiff to pay the time certificates when due.

On defendant's part it stands conceded that it got the money on the three time certificates, that it put on them the indorsement, "Pay American Exchange Bank, St. Louis, or order," over its signature, before due and sent them before due to the American Exchange Bank with instructions to collect.

On plaintiff's part it appears, *nem. con.,* that when the American Exchange Bank demanded payment, plaintiff demanded to know what relation the American Exchange Bank bore to the certificates, how that bank held them, and such information was denied. In that condition of things, plaintiff after taking time to consider concluded to pay them and did so on the advice of its attorney that they were negotiable. Mr. Galbreath testified that at that time plaintiff knew defendant disclaimed liability. It stands conceded, furthermore, that there was no prior authority given by defendant to Mispagel to execute the guaranty, and that unless defendant is bound on all the facts it is not bound at all. The pledged collaterals (except the collection made on the deed of trust, a few hundred dollars credited, as said, on the principal note) were tendered to defendant.

It appears that while defendant claims it repudiated the act of its cashier in executing the guaranty as soon as it knew of it and finally, as agreed on all hands, denied all liability to plaintiff, yet plaintiff from the outset insisted defendant was liable and that the delay in bringing suit (about three years) was an act of courtesy shown by plaintiff at the instance and suggestion of defendant itself to avoid embarrassment to its credit while readjusting its affairs and getting on its feet after Mispagel's malversations.

Originating in St. Charles County, the venue of the cause was changed to Boone. There it was tried before Judge Nick M. Bradley, the judge of another circuit who was acting at that term in the place of the regular judge, Waller, ill and absent. The bill of exceptions was settled and signed by Judge Bradley at a subsequent term when Judge Waller was presiding.

Such is the material record, barring defendant's objections to certain evidence, to appear when the point is up for determination.

Counsel argue *seriatim* a formidable aggregation of propositions.  As both sides appeal and propositions advanced by one are, as a rule, only varying phases of related propositions advanced by the other, they run concurrently and we can without confusion consider both appeals at the same time, sifting from briefs material propositions and putting them in our own way, thus:

(1)  The bill of exceptions was not signed by the proper judge, hence is not valid and we have nothing here but the record proper.

· (2)  The court erred in favor of plaintiff in admitting over defendant's objection oral testimony to vary the written· contract in suit.  (And herein of a contention that the representations made by Mispagel to plaintiff at the time of the contract were outside his duties as cashier of defendant bank, hence are not binding on it.)

(3)  And in finding against plaintiff on the common count for money had and received.

(4)  And in finding against defendant on the first count.

I.  *Of the bill of exceptions.*

Judge Waller, regular judge of the Boone Circuit Court, was sick.  Acting under Revised Statutes 1909, section 3960, he requested Judge Bradley, judge of another circuit, to hold the term of court in Boone at which this case was tried.  Section 3960, among other things, provides that the judge so called in "shall, during the period he shall so act, possess the same powers and be liable to the same responsibilities as the judge of said circuit."

Steps were taken for cross-appeals, time was allowed to settle a common bill of exceptions.  At a subsequent term the common bill was signed by Judge Bradley and filed.  Plaintiff's counsel now suggest (diffidently we opine and under cover of the phrase

"it seems") that the bill was improvidently allowed and signed by Judge Bradley instead of by Judge Waller. We hold the point without substance.

In doing so it is not necessary to stress the fact that whatever Judge Bradley did in signing the bill he did at the instance and request of both parties, that the bill was a common one, was authenticated and filed in due time and form, and if error was committed in getting the wrong judge to sign it both parties are at fault in tolling the court into that error. Does not the maxim run: *Omnis consesus tollit errorem?* We say we need not apply or rely on that view of it, though we mark the spot with a judicial pin prick in order not to be precluded should it become decisive in some other case. The quoted maxim is full of wisdom and is of wide application. [Star Bottling Co. v. Exposition Co., 240 Mo. 634.]

We prefer to put our ruling on the proposition that the statute contemplated, as one of the powers and responsibilities belonging to Judge Bradley when sitting for a sick brother, that he should in a case tried by him preside in completing the record in a matter involving the verity of the incidents and rulings of such trial. Who should know them better than he? Somewhat agreeably to the figure of Bleckley, J., in Hull v. Meyers, 90 Ga. l. c. 677, so we say; common sense does not always make law, but law and common sense are likely to be one and the same unless divorced and thereby violently put asunder by lawmaker or judge. In this matter they have not been divorced. The signing of the bill was a mere incident to the main power granted the sitting judge by section 3960, and it has been so ruled pointedly. [State v. Bobbitt, 215 Mo. l. c. 29, *et seq.;* Bower v. Daniel, 198 Mo. l. c. 315.] The general doctrine is: "Whenever a power is granted by statute, the grant of such power carries with it by necessary implication, everything necessary to make such grant effectual." Incidents

follow tacitly. [State ex rel. v. Perkins, 139 Mo. 1. c. 118; Church v. Hadley, 240 Mo. 680.]

II. *Of error in the admission of testimony.*

Over timely objections plaintiff was allowed to prove conversations tending to show a verbal agreement to make the $20,000 loan to defendant and not to Baird, that the attitude and relation of the two banks at very bottom, despite the mere form, was that of borrower and lender. As shown by the statement of facts, the testimony objected to took now one form and then another in conversations with Mispagel, but the effect we have stated. Saving exceptions to such rulings, defendant insists that prejudicial error thereby crept into the case. In deciding the point it is needful to bear in mind that there are three counts in the petition and that the trial progressed on all three at once. Therefore, when the question of the competency of proof is up, that question, from the very nature of things cannot be determined by narrowing the proof to one count, but it must be viewed at large with reference to all. A rule which would exclude a piece of evidence, because in and of itself it does not sustain one count when it might with something more sustain another, is unsound, because it would enable the adversary party to exclude piecemeal what taken as a whole would maintain some proper issue. (Billings v. Monmouth, 72 Me. 1. c. 177, *arguendo*.) If the case stood alone on the first count we should rule some of the proof incompetent but, as it does not, we think it well enough. This, because:

(a) A good deal of the challenged testimony related to the consideration for the guaranty. In so far as it touched that point it was competent on the first count. The general doctrine is that the consideration clause of a contract is in the nature of a receipt and is open to explanation by parol. [Squier v. Evans, 127 Mo. 1. c. 519; Liebke v. Knapp, 79 Mo. 1. c.

26-7.] Especially should this be so where, as here, the contract of guaranty does not purport to name *all* the considerations but contains the clause· "and other valuable considerations to them moving."

(b) But the testimony in hand went beyond that boundary line. In some of its phases its tendency was to show, as said, that the contract of the guar antor was not in fact that of a guaranty, as solemnly recited in the writing, but a different one. Observe, the first count was not a suit to correct an instrument for mistake or on any other head of equitable cognizance—*contra,* it was a suit at law declaring on a written guaranty whereby the guarantor undertook to guarantee to plaintiff the payment of a note described elsewhere in the writing, together with all renewals thereof, and whereby the guarantor waived the right to insist on plaintiff's exhausting its other remedies before proceeding on the guaranty. Neither is the guaranty ambiguous or imperfectly expressed so as to let in parol proof to seek out and get at its true intendment. In a suit to recover on a guaranty like that at bar, as on other written contracts, the universally accepted doctrine is that parol proof is not admissible to alter or vary, by enlarging or diminishing, its terms, or to put on foot a different relation between the parties to that prescribed by the instrument itself. A rule that would permit that to be done as to a part of a contract in suit would permit it to be done as to all of it. It would be tantamount to say that contracts are written in water. It would subject the dealing of mankind to an incurable confusion and paralysis. Therefore in a suit on an unequivocal written contract it must speak for itself as its own interpreter. A party who declares on it must abide the event and stand or fall on its very terms. The foregoing propositions are so trite and elementary they need no aid from a line of cases. We refer to a late

one (Beheret v. Myers, 240 Mo. 58) and pass the matter by.

It is on such premises we hold the testimony improper on the first count. It follows that so far as it swayed, if it did sway, the mind of the court on that count and led up to a judgment for plaintiff thereon, its admission was error affecting the merits.

(c) It is argued that Mispagel on October 13, 1904, was not acting on behalf of defendant; that he was engaged in matters outside of his duties as cashier; hence the conversations between Mispagel and plaintiff's officers should have been excluded. But we are not impressed with that view of it. Absent a statute (of which more presently) the general rule is that: "The cashier of a bank is held out to the public as having authority to act according to the general usage, practice and course of business of such institutions. . . . In short, he is considered the executive officer of the bank through whom the whole moneyed operations of the bank, in paying or receiving debts, or in disposing or transferring securities, are conducted. . . . The acts of a cashier, done in the ordinary course of the business actually confided to such an officer, may be regarded prima facie as coming within the scope of his duties." [Bank v. Hughes, 62 Mo. App. 1. c. 581-2, and cases and authorities cited.]

Whether Mispagel had authority to execute the guaranty we shall presently consider. That question does not relate to the mere admission of testimony. It goes to the right to a judgment on the first count. The contention that said conversations are inadmissible because Mispagel was outside of his duties to his master and pursuing his own affairs in negotiating with plaintiff, we cannot allow as sound. Even on defendant's own theory Mispagel had authority to loan the moneys of the bank on time deposits in St. Louis.

244 Mo. Sup.—37

But aside from that the negotiations were an entirety. As part of them, and as cashier, he negotiated those deposits in fact. He negotiated the considerations for the certificates. He received the latter. He took them to defendant bank. He put them among its assets. He, and no one else, accepted them for the bank. Whatever title he got to the two in question as agent for defendant is the only title the bank has to them— the only title it seeks to sustain. May a defendant repudiate the negotiations of its cashier bringing to it such a windfall (with one hand) and at the same time (with the other) clutch the gains? May it take the gift and repudiate the hand fetching it? May it take as principal and deny the agency? To so hold would be bad law and worse morals. Even the red Indian has an adage: You should not call the forest that sheltered you, *shrubbery*. To say of one that he drank of a spring and then turned his back on it, or climbed by a ladder and then struck it down, is but to speak the bitter proverbs of the fireside against ingratitude. However, some of the comments just made are more pertinent to the right to recover presently considered. They bear only incidentally on the admission of testimony.

(d)    Turning to the third count, it is for money had and received. It is not on the written contract of guaranty. It lays the guaranty, as such, out of the case. It cuts back of that writing and goes to the root of the matter by encompassing all the facts. Whether the testimony makes a case is not now the question. For the present purposes it is enough to rule, as we do, that on the third count evidentiary rules designed to protect the integrity of the terms of the guaranty sued on in the first count are not applicable. On the third count the guaranty merely goes in as a fact for what it is worth with all other facts making up the transaction from end to end and side to side. On that count the testimony was proper.

Accordingly, we rule the point against defendant, except in so far as the right to recover on the first count is predicated on the challenged testimony. (*Vide,* paragraph "b" under this head.)

III. *On the right to recover on the third count.*

If plaintiff was entitled to recovery on the first count, it suffered no harm in being denied one on the third. It could only have one recovery where all counts related to the same transaction and the pleader puts his case on different hypotheses in separate counts to meet the possible proof. In this view of it there lies at the threshold under this head, the preliminary question whether a recovery would go on the first? To that we address ourselves.

(a) On that preliminary question with no little doubt and consequent hesitation, for there are strong authorities running the other way, we conclude that, when we keep in mind that the first count was on the written guaranty, and that it stands conceded that Mispagel had no prior authority to execute that guaranty, plaintiff could not recover on the first count. The guaranty recites that the note of Baird was guaranteed by defendant. Strictly speaking, and confining ourselves to the bare recitals of that instrument, the guarantor was not loaning money (a prime function of a bank), it was lending the credit of the bank for the accommodation of Baird—another thing, and one, considered by itself, of doubtful propriety. It matters not that at bottom the transaction was really not that way; for on the first count we are concerned solely with what the writing says and that is what it does say. For that turn and to that extent the guaranty was not binding on defendant. [Bacon v. Bank, 79 Mo. App. 406.]

Something is made of two statutes, Revised Statutes 1909, section 1099 and section 1112, in the chapter on banks. Section 1099 provides, *inter alia,* that

"no bills payable shall be made . . . except with the consent of the board of directors." Section 1112 provides, *inter alia,* that "the cashier . . . shall have no power to endorse, sell, pledge or hypothecate any notes, bonds or other obligations received by said corporation for money loaned, until such power and authority shall have been given such cashier . . . by the board of directors, in a regular meeting of the board, a written record of which proceeding shall first have been made." A subsequent clause in the same section makes the interdicted acts void. Those sections were elaborately and closely construed by our brother Woodson in Bank v. Lyons, 220 Mo. 538, in a way meeting the approval of this court. Under the reasoning of that case it is difficult to see how the language of those two sections can be held to cover a guaranty by defendant bank. Certainly the words of the statute are unfortunate and inapt if the lawmaker was striking at guaranties. A guaranty is not a bill payable, nor by making one is there an indorsing over, pledging or hypothecating of the bank's notes, bonds or other obligations. But the point is not necessary to our case and we do not decide whether a guaranty comes within the mischiefs aimed at in those sections. We prefer to put our decision against recovery on the first count on the broad proposition that under the strict terms of the guaranty in suit (and looking no further), defendant bank was neither loaning money nor receiving money in the ordinary course of banking business, but was lending its credit for the accomodation of another through the unauthorized act of its cashier. In this connection we are somewhat relieved from embarrassment by the fact that learned counsel for plaintiff were not willing to stand on the first; they cast an anchor to the windward by appealing from the adverse decision on the third count. That course, we think, must be taken as a concession, first, of doubt on the validity of their judgment on the first

count, and, second, that the situation was so grave as
to warrant keeping open the road to another remedy.
That he who follows two hares is sure to catch neither,
is an old adage, but it is of no appreciable use in dis-
pensing justice through the courts.

(b). This brings us to the final question, to-wit:
The right to recover as for money had and received.

(1). Before the discussion proper we submit a
foreword thus: Changing the phrase in a bill of rights
of a sister State, we think it self-evident that the
usefulness of jurisprudence is enhanced by a frequent
recurrence to fundamental principles. It was a fa-
mous Greek (was it not?) who said in effect, that argu-
mentation should be begun by a statement of proposi-
tions not to be gainsaid. Agreeably to those ideas, we
observe that some of the cardinal precepts of the law
are: The obligation to do justice rests upon all per-
sons, natural or artificial. It is equity that he should
have satisfaction who sustained the loss, and that he
should make satisfaction who received the benefit. By
the law of nature itself, it is just that no one become
rich by the detriment and injury of another, i. e.,
unjust enrichment is abhorrent. The common law,
says its great master, is a science at once "copious
and sociable." By which COKE means, I think, that it
is a bundle of doctrines tending to make ideally toler-
able the relations of men with each other. The action
for money had and received was sprung and fostered
under the glow of such broad and enlightened prin-
ciples. There is a growth in that behalf and the con-
stant tendency is to widen the scope of that action.
Though an action at law, it is so favored by courts
and is so flexible in form and relief that it levies tri-
bute indifferently on equitable as well as strictly legal
principles. In the exposition of the matter, therefore,
we may refer to the precepts of both law and equity,
as above. The accepted rule is that "the action lies
where 'defendant has received or obtained possession

of the money of the plaintiff, which, in equity and good conscience, he ought to pay over to the plaintiff.'"

It goes further and lies for things treated as money and when such is the case the count may be supported by evidence of defendant's receipt of bank notes, promissory notes or credit in account in the books of a third person, etc. [Clifford Banking Co. v. Donovan Commission Co., 195 Mo. l. c. 288, et seq.; 2 Greenleaf Ev. (16 Ed.), secs. 117 and 118.]

(2) The facts of this record, we think, make it a typical case in which to apply the principles underlying the action for money had and received. If the case were one in which Baird in reality had borowed or received money from plaintiff and thereafter used that money in paying his debt to defendant and which defendant had received in good faith (or ordered paid out) in the usual course of business as such payment, we would have a different case to deal with. Such hypothetical a case would be like Vandagrift, Receiver, v. Masonic Home of Missouri, 242 Mo. 138. But taking the transaction of October 13, 1904, as uncovered and established by the evidence in the case at bar, it differs in essential particulars from that case and the cases upon which it must rest as a sound judgment. Here Baird did not borrow the money of plaintiff. Mispagel made a proposition to that effect to plaintiff, but it was declined; and the actual, naked transaction was that defendant bank through the form of a written guaranty and through its cashier negotiated a $20,000 loan with plaintiff to stiffen its reserves. Baird was a stranger and not a customer of plaintiff, it had the right to refuse him a loan and, under the uncontroverted proof, did refuse it to him. The eye of justice, looking straight to the heart of the matter, discards the mere evidentiary shell or form adopted at Mispagel's request, sees the cashier of defendant bank initiating, shaping and hovering over the matter, using the broken grain gambler and his discredited

collaterals as a mere dummy or man of straw; sees
Mispagel, as defendant's cashier, dictate and receive a
credit on plaintiff's books in favor of defendant for the
proceeds of the loan; sees the invalid guaranty on the
strength of which the loan was made; sees him take
two negotiable certificates of deposit for that credit,
take those certificates to defendant and put them in its
coffers; sees defendant claim them and, finally indors-
ing them, put them ostensibly into circulation as cou-
riers without luggage, and get the proceeds of them by
cover of that indorsement under the law of negotiable
paper. In all this Baird had no substantial voice from
start to finish, so far as shown. He saw and handled
no dollar of the money and paid out none of it by
check, order or direction. In short, it was not his and
never was. Indeed, on defendant's books the two cer-
tificates, so far as connected with any book entry, ap-
peared as proceeds of a loan made by defendant by
way of a time deposit in plaintiff's bank, against
which the certificates were drawn. That Mispagel
afterwards and, for aught appearing here, as an after-
thought, handed Baird four of his discredited and
worthless drafts we cannot look on as of vital signifi-
cance. Those drafts at best were mere evidence of a
debt. To hand them to Baird paid no debt of his to
anyone. That delivery was only colorable and is not
shown to have been brought about by any agreement,
express or implied. If Mispagel, as defendant's cash-
ier, cashed those drafts originally in behalf of de-
fendant in the usual course of banking, then defend-
ant had notice of their worthlessness and of all facts
lying back of them covering the whole affair, for no-
tice to the cashier transacting the business of the
bank is notice to the bank. [Bank v. Lovitt, 114 Mo.
l. c. 525.] Again, if defendant, as it seems to do,
adopts Mispagel's act as cashier in handing over those
worthless drafts, then once more notice to him as cash-
ier is notice to defendant.

But the question of notice does not rest alone with Mispagel. Before defendant did the final act of consummation, whereby it got the cash on the certificates, it had full notice from Arnold, assistant cashier of plaintiff, of the true condition of things, and thenceforward it cannot claim it acted otherwise than with wide-open eyes and charged with knowledge.

Recurring to the whole subject of notice to defendant through Mispagel, the Supreme Court of Massachusetts in Atlantic Mills v. Indian Orchard Mills, 147 Mass. 1. c. 273-4-5, lays down acceptable doctrine. The question was on defendant's right to a setoff, and the facts were like ours in some important features. Says ALLEN, J., for that court:

"It is true that no officer of the plaintiff besides Gray knew of the fraudulent origin of these checks, but in the very transaction of receiving them, the plaintiff was represented by Gray, and by him alone, and is bound by his knowledge. It is the same as if the plaintiff's directors had received the checks, knowing what he knew. For the purpose of accepting the checks, Gray stood in the place of the plaintiff, and was the plaintiff. It is quite immaterial in reference to this question, in what manner or by what officers of the corporation the funds were afterwards used. The important consideration is, how the plaintiff became possessed of the money; and it is apparent that it was through the act of no other person than of Gray himself. . . . It must be deemed to have known what he knew; and it cannot retain the benefit of his act, without accepting the consequences of his knowledge. The plaintiff cannot obtain greater rights from his act than if it did the thing itself, knowing what he knew. . . . The rule is general, that, if one who assumes to do an act which will be for the benefit of another, commits a fraud in so doing, and the person to whose benefit the fraud will enure seeks, after the knowledge of the fraud, to avail himself of that act,

and to retain the benefit of it, he must be held to adopt the whole act, fraud and all, and to be chargeable with the knowledge of it, so far at least as relates to his right to retain the benefit so secured."

Says LORING, J., for the same court (Newell v. Hadley, 206 Mass. l. c. 346): "Apart from authority it would be a strange doctrine if it were law that the true owner of money lost his title to it by a thief who stole it undertaking to use it in paying a debt owed by the thief to another, *when*" mark the vital distinction *"the thief and no one else received for that other the payment so made.* It is not conceivable that such a manipulation by a thief of stolen money should result in the true owner's losing his title and the creditor of the thief getting a better title to the money than the thief had to it."

In People's Bank v. Bank, 101 U. S. 181, defendant's cashier without authority guaranteed the payment of the notes of a customer which plaintiff bank discounted. The facts there are not dissimilar in salient features to the case at bar. It was held plaintiff could recover on the guaranty itself. *A fortiori,* we think recovery could go in an action for money had and received. In that case is the following apposite language: "All the parties engaged in the transaction and the privies were agents of the defendant. If there were any defect of authority on their part, the retention and enjoyment of the proceeds of the transaction by their principal constituted an acquiescence as effectual as would have been the most formal authorization in advance, or the most formal ratification afterwards."

In Bank v. Trust Company, 187 Mo. 494, defendant indorsed the paper of a railroad corporation in which it was interested and received benefits from the transaction. The plea was *ultra vires.* Speaking through Fox, J., we said (p. 536): " . . . and if the defendant can avoid the payment of the note in suit,

upon the plea that its act was a wrongful one, in excess of its powers and void, then we confess, that the maxim, which is as old as the law itself, that 'no person can take advantage of his own wrong,' is absolutely shorn of all its force and vitality under our system of jurisprudence." That case was a suit on the paper itself, and what was said applies with double force when the suit, as here, is on all the facts for money had and received.

In Bank v. Lyons, Receiver, 220 Mo. 538, the cashier of a bank that went into the hands of a receiver, borrowed a large sum of money from another bank and issued its note therefor. His action was unauthorized, but because his bank received the benefits of the loan, its estate in the hands of its receiver was held liable for money had and received. In that case our brother WOODSON, pursued his investigation of the question industriously and far. His opinion is replete with a wealth of case learning and is on all fours in essential matters. True in that case there was no third party or dummy like Baird. And if the office filled by Baird in this case was a material factor, Bank v. Lyons would have to be reckoned with in connection with such factor. But the function of Baird in our case was immaterial, he did not a whit in getting the money, he got none, he borrowed none, he was a mere cover for the bank and when the *form* of the transaction is laid aside he is disposed of by the maxim, *ex nihilo nihil fit*—out of nothing nothing comes. "If," said this court in that case, in referring to the borrower, "it repudiates the note for the reason that the board of directors had not authorized its execution, then this court would sanction rank injustice to hold that payment of that money need not be made at all. Such is not the law. The bank is not exempt from the common obligation to do justice which binds individuals. Such obligations rest upon all persons whether natural or artificial. If the bank obtained the money

and by mistake or without authority of law executed therefor an invalid note, then it was its duty, under this general obligation to do justice, to refund it. Under those conditions an implied obligation arose on the part of the appellant to repay the money so obtained.'' For "note" read "guaranty," as we may, and that case is this on principle.

In addition to authorities cited in Bank v. Lyons, counsel for plaintiff present an array of others abundantly supporting the proposition that plaintiff, on the facts here, is entitled to recover on its common count for money had and received. Appleton v. Bank, 190 N. Y. 417, affirmed in 216 U. S. 196; Bank v. Bank, 15 N. D. 594; Aldrich v. Bank, 176 U. S. 618, are samples of them.

(3). There is a doctrine of the law that a payment made without duress of person or property and without fraud or any form of imposition cannot be recovered back. Defendant calls on that doctrine for help and cites a line of cases, of which Hethcock v. Crawford County, 200 Mo. 170, is one. But none of those cases break on the facts at bar. If defendant had not indorsed the time certificates before due and parted with the possession of them in a way that clothed the American Exchange Bank with apparent ownership; if that bank as defendant's collecting agent had frankly disclosed upon demand of plaintiff that it held the paper merely for collection; and if plaintiff had known to a moral certainty that defendant bank would eventually repudiate the guaranty, when subsequently it matured, we say if such had been the facts, then we do not say that plaintiff could not recover back the money it paid, but we do say we would have a different problem to solve. This plaintiff paid those certificates under the advice of its counsel that the paper was negotiable and was in the hands of another party. While it finally turned out the American Exchange Bank held the paper as a collecting

agency for defendant, yet plaintiff knew it not and
was refused information. It would put plaintiff in
hard lines to be obliged to contest liability on those
certificates with said apparent owner and take its
chances of showing that the holding bank was *not* an
innocent purchaser for value before due. While that
case was dragging through the courts the effluxion of
time might release defendant from liability for money
had and received. Considering the negotiable char-
acter of that paper we think it too narrow a view to
consider alone the fact that plaintiff responded to its
own obligation, leaving defendant to respond to its
own when it fell due. But even on that view we are
of the opinion that plaintiff acted ethically and com-
mercially in good form when it protected its own pa-
per and should not be punished for doing so. The
case, however, must be considered on all the facts,
and as defendant put plaintiff to the hazard of guess-
ing at its own risk whether the American Exchange
Bank owned the paper, it ought not to be allowed to
escape liability because plaintiff guessed wrong. In
equity and good conscience plaintiff owed defendant
nothing whatever, defendant has been unjustly en-
riched by plaintiff's money, and it must make restitu-
tion.

There are other questions discussed but we deem
them not of substance.

As the judgment was on the first count and in-
cluded eight per cent interest we are not at liberty to
consider the count on which it was rendered as imma-
terial as we could have done otherwise. The third
count would draw a different and lower rate of inter-
est. Accordingly the judgment is reversed and re-
manded with directions to find in favor of defendant
on the first and second counts and to find in favor of
plaintiff on the third for the amount remaining due
on the $20,000 note, deducting payments thereon and

adding interest at six per cent from the proper date of bringing this suit.

This case coming into Banc from Division Number One, the foregoing divisional opinion is adopted in Banc. *Valliant, C. J., Graves, Ferriss* and *Kennish, JJ.,* concur; *Brown, J.,* concurs in result; *Woodson, JJ.,* dissents in an opinion filed.


## DISSENTING OPINION.


WOODSON, J.—The facts of this case are few, simple and undisputed and the principles of law governing them are plain and well understood, and there should be no difficulty in applying them to the facts, by court or counsel.

On and prior to October 13, 1904, one W. J. Baird was indebted to the St. Charles Savings Bank in the sum of about $65,000, which was evidenced by his several promissory notes, held by the bank. In order to reduce that indebtedness, he and A. F. Mispagel, the cashier of the bank, arranged to go to St. Louis and have Baird borrow $20,000 from the plaintiff bank, and pay the same on his indebtedness to the St. Charles Bank. In pursuance to that arrangement, Baird and Mispagel, on said date, went to St. Louis, called at the banking house of the plaintiff, and made known to its proper officers the object of their visit, namely, that Baird wanted to borrow from the plaintiff bank the sum of $20,000, and pay it on Baird's indebtedness to the defendant bank. After a full statement of the matter, the plaintiff agreed to lend said money to Baird, on his note, secured by the collaterals mentioned in the majority opinion, and provided the defendant bank would sign Baird's note as guarantor. This was agreed to, and in pursuance thereto the officers of the plaintiff bank drew up the note of $20,000,.

for Baird to sign, the collateral contract pledging the notes and stocks of Baird to the plaintiff bank, as collateral security for the payment of said $20,000 note, and the guaranty contract of the defendant bank, guaranteeing the payment of said note.

After those documents had been prepared by the officers of the plaintiff bank, they were presented to Baird and Mispagel for execution, and thereupon Baird signed the $20,000 note and the collateral contract, pledging to the plaintiff bank the notes and stocks described therein, as collateral security for the payment of said $20,000; and at the same time, Mispagel, as cashier, signed the name of the defendant bank to the contract guaranteeing the payment of said $20,000 note. Therewith the plaintiff bank issued and delivered to the defendant bank two certificates of deposit each for $10,000, bearing three per cent interest, due in *ninety* days, the proceeds of the Baird loan.

At the same time, and as part of the same transaction, the defendant bank cancelled and delivered to Baird, in consideration of said $20,000 paid by him to it, through the plaintiff bank, $20,000 in face value of the notes it held against him, thus reducing his indebtedness to the defendant bank $20,000, leaving his indebtedness to it in a sum of about $45,000, instead of $65,000 before the payment was made.

At the maturity, the two certificates of deposit of $10,000 each were presented by the defendant, through the American Exchange National Bank of St. Louis, to the plaintiff bank, for payment, and payment was made. Some three years after said certificates were paid by the plaintiff bank to the defendant bank, it instituted this suit to recover from the latter the $20,000 loaned by the plaintiff to it as previously stated.

These are not only the plain unvarnished facts of the case, but they are undisputed and incontrovertible, for the reason that they are in writing, and those

writings were drawn and prepared by the plaintiff's own agents, for the signatures of Baird and Mispagel, and they  executed them in the form as they appear in this record, which are as follows:   (The note of Baird to the plaintiff bank, for $20,000, and the collateral contract executed by him to it, pledging certain notes and stocks of his to said bank as collateral security for the payment of said $20,000 note, if we understand the record correctly, were executed upon one piece of paper, but that is immaterial).  The note reads:

"$20,000.          St. Louis, Mo., Oct. 13, 1904.
"Ninety days after date, I promise to pay to The Third National Bank of St. Louis, or order, at the banking house of said bank, at St. Louis, Mo., twenty thousand 00|100 dollars, for value received, with interest at the rate of 8 per cent per annum, from maturity.
"W. J. BAIRD."

The collateral contract reads:
"Having executed a promissory note, dated at St. Louis, Mo., on the 13th day of Oct., 1904, for $20,000 payable to The Third National Bank of St. Louis or order ninety days after date, with interest from maturity at the rate of 8 per cent per annum; and being desirous of securing the same, and all my other liabilities, actual and contingent, to said bank now existing or which may hereafter arise, I do hereby pledge to said bank and its assigns, as collateral security for said note and said other liabilities ........
.......... $5,000 note W. J. Baird, dated 10-1-04 payable 90 days after date, $10,000 note W. J. Baird, dated 10-1-04 payable 6 months after date, secured by deed of trust, 73 shares McKittrick Milling Co., and agree to give additional security to keep up the present margin, whenever the market value of the above

collateral should decline, and within twenty-four hours after receipt of notice so to do from the holder of said liability. In default of payment of said note or other of said liabilities at maturity, or in default of my giving such additional security when so notified, or in case of suspension, failure or insolvency, or the commission of any act of insolvency on my part, said bank shall, in addition to the foregoing collateral, have a lien on all notes, drafts, bills receivable or moneys held by or in transit to said bank in my name or for my account, the same to be deemed to have been assigned to said bank as additional collateral for the payment of said note, and all other of my said liabilities actual and contingent; said bank or the holder of such liability, to have the option of any or all of said collaterals before sale, or of the proceeds thereof after sale, upon any, either or all of said liabilities as it may elect, and upon such default being made, I do hereby authorize said bank, its officers or the holder of said liability, to sell or cause to be sold any or all of said collaterals, or any substitutes therefor, at public or private sale at the Merchants' Exchange in St. Louis, or elsewhere, at the option of the holder, with or without notice to me or the public, and to apply the proceeds, first to the payment of the expenses incurred by said sale, next to the discharge of my liabilities as hereinbefore set out. Any surplus left shall be paid to me. If the proceeds of such sale are not sufficient to pay all my liabilities hereby secured, I agree to pay the balance on demand. In case of a sale of any or all of said collaterals, said bank, or the holder of any liability hereby secured, may become the purchaser thereof, without any right of redemption on my part. If this agreement is signed by more than one party, it shall be held as made by and binding upon each and all the parties signing it.

"W. J. BAIRD."

Across the face of said note is the following:

"Protested for nonpayment at the city of St. Louis, Mo., this 14th day of January, 1905.

"THOS. F. GALT, Notary Public.

"Fee, $2.95."

Indorsed on the back of said note is the following:

"3|13-05, Paid 1200.

"11|13|05, Paid 203.90."

The contract of guaranty executed by Mispagel, cashier of the defendant bank, reads:

"The Third National Bank of St. Louis.

"Whereas, W. J. Baird . . . has executed his promissory note dated St. Louis, Mo., Oct. 13, 1904, payable ninety days after date to the order of the Third National Bank, St. Louis, Mo., for twenty thousand 00/100 dollars, $20,000, and secured by $5000 and $10,000 notes of W. J. Baird, payable ninety days and six months from date respectively, the note of $10,000 being secured by deed of trust and 73 shares Connery Commission Co., and 209 shares McKittrick Milling Co., the same having been offered for discount to the Third National Bank.

"Now for value received, and in consideration of one dollar paid to the undersigned, receipt of which is hereby acknowledged, and in consideration of the discount of said note, by said bank, and other valuable considerations to them moving the St. Charles Saving Bank for themselves, their successors or assigns, hereby guarantees to the Third National Bank of St. Louis, Mo., its successors or assigns, the prompt payment of the aforesaid note, as well as any renewals thereof. Whenever said note, or renewals thereof, shall become due and remain unpaid, the undersigned will, on demand and without notice of dishonor or protest, pay the amount due thereon to said Third National Bank of St. Louis, its successors or assigns,

244 Mo. Sup.—38

and it shall not be necessary for said bank in order to enforce payment, to first institute suit or exhaust its remedies against the other parties liable on said note.

"St. Charles Savings Bank,
"per A. F. Mispagel, Cashier."

"Date, Oct. 13, 1904."

Neither the validity of this transaction, as a whole, nor the execution and validity of the note, the collateral contract or the contract of guaranty, just copied, are challenged for fraud or otherwise, in the pleading or evidence.

I. At the trial, the plaintiff bank, over the objections of counsel for defendant, offered and the court admitted a great mass of parol testimony, covering about one hundred pages of the record, contradictory of the written instruments introduced in evidence, and tending to prove the facts of the transaction to be as they are stated by my learned associate, who wrote the majority opinion. That action of the court is assigned here as reversible error.

It is elementary, and it seems to me that a citation of authorities is unnecessary to support the proposition, that parol evidence is inadmissible to contradict, add to, take from, or explain the meaning of a written contract; nevertheless, that horn-book principle of law was most flagrantly violated by the learned trial court in this case.

The textbooks and adjudged cases announcing that doctrine, are as old or older than our jurisprudence, and as numerous on both sides of the Atlantic as are the grains of sand on the sea shore.

However, at the risk of being criticised by the bench and bar for doing such a useless thing, I am going to cite a few of our own later adjudications, bearing upon this "same old, old story."

In the case of Morgan v. Porter, 103 Mo. 135,

l. c. 140 and 141, this court in discussing this question used this language. " 'No rule of evidence is better established than the one which says, when the parties have put their contracts in writing in the absence of accident, fraud or mistake, it is conclusively presumed that the whole engagement and the extent and manner of their undertaking was reduced to writing.' This is the language of Judge BLACK in the case of State ex rel. Yoeman v. Hoshaw, 98 Mo. 358. This rule we apply to the case at bar, and the court below, when defendant utterly failed to prove that a portion of the contract was omitted from the writing, either by accident, mistake or fraud, ought to have excluded all the evidence which was intended to show that Ellison agreed to build a house on the premises. The doctrine laid down by Judge BLACK in the case cited above is indeed well settled on principle and authority. Indeed, no rule is better settled."

In Tracy v. Union Iron Works, 104 Mo. 193, l. c. 198 to 200, this court said: "The general rule excluding evidence of contemporaneous, or prior verbal agreements, varying or contradicting the terms of a valid written instrument, is the outgrowth of the common experience of man. It is of great antiquity and appears in other systems of jurisprudence besides our own. [Corp. Jur. Civ., Cod. Lib. 4, Tit. 20; Tait's Evid., pp. 326, 327.] It rests on principles somewhat analogous to those which underlie the doctrine of the conclusiveness of judgments upon parties thereto. It is said to be the interest of the State that there should be an end to litigation. Accordingly, the record that closes a forensic controversy is regarded as merging the matters litigated to the extent declared in the judgment. So, in private adjustments of reciprocal rights, it is wisely considered that, when parties have deliberately put their mutual agreements into the form of a completed written contract, that expression of their intention should be accepted as a

finality, in which is merged all prior negotiations within the scope of the writing. But the rule has too long occupied a place as a corner stone in the law of evidence to require, at this day, any justification of its existence. We may, however, properly remark that the adoption of the modern practice, admitting as witnesses the parties directly interested in the action, seems to add a cogent reason to those existing at the common law, for a close adherence to the rule under discussion. If the uncertainty of 'slippery memory' furnished a ground for excluding such verbal testimony in the days of Lord Coke [Countess of Rutland v. Earl of Rutland (1604), Coke's Reports, part 5, 26a], how much stronger reason for such exclusion to-day when the influence of self-interest is so likely to render the memory of litigating parties more 'slippery' than was that of the witnesses of olden time. In Missouri the general rule has been repeatedly approved in early, as well as recent, decisions. [Woodward v. McGaugh, 8 Mo. 161; Walker v. Engler, 30 Mo. 130; State ex rel. v. Hoshaw, 98 Mo. 358; Morgan v. Porter, 103 Mo. 135.]''

In Laclede Construction Co. v. Moss Tie Co., 185 Mo. 25, l. c. 61 and 62, this court said: ''The controversy in this case demands a construction and ascertainment of what in truth and in fact was the contract between the defendant and plaintiff as to furnishing railroad ties by defendant to plaintiff. Whatever that contract was, it must settle the respective rights of the parties to this action. Both at common law and in this State it is the settled rule that when parties have put their engagements in writing, in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking were reduced to writing; and all oral testimony of previous colloquium between the parties or of conversations or

declaration at the time when it was completed or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly of one of the parties, is rejected. In other words, as the rule is now more briefly expressed, parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument. [Tracy v. Iron Works, 104 Mo. 193; 1 Greenleaf, Ev. (16 Ed.), sec. 275.]''

In Reigart v. Coal & Coke Co., 217 Mo. 142, l. c. 160, this court said: ''In the case of Boyd v. Paul, 125 Mo. l. c. 13, and 14, SHERWOOD, J., used this language: 'In the first place, it is one of the fundamentals of the law of evidence that all precedent as well as all contemporaneous negotiations in relation to a contract afterwards reduced to writing, are, in the absence of accident, etc., conclusively presumed to have been swallowed up by, and entirely merged and expressed in, the written instrument, which thenceforth becomes the sole expression of the will and agreement of the contracting parties. This rule has been unvaryingly observed and announced by this court from its earliest to its more recent decisions. [State ex rel. v. Hoshaw, 98 Mo. 358, and cases cited; Tracy v. Iron Works Co., 104 Mo. 193, and cases cited; Jones v. Shepley, 90 Mo. 307, and cases cited.] In the second place, that portion of the contract which was *dehors* the written assignment of the lease rested in parol, and could not be introduced in evidence without acting in plain contravention of the Statute of Frauds. Where your memorandum under the statute is scant in measure you cannot piece it out by verbal additions. This subject has been recently and satisfactorily discussed in Ringer v. Holtzclaw, 112 Mo. 519, per GANTT, P. J.' ''

To the same effect, are Bank v. Terry, 67 Mo. App. l. c. 16, 17, and 18; Helmrichs v. Gehrke, 56 Mo. 79 to

81; Squier v. Evans, 127 Mo. 514, l. c. 518 to 520; Harrington v. Brockman, 107 Mo. App. 418; Farmer's Bank v. Bayless, 35 Mo. 428; Same v. Same, 41 Mo. 274.

And a promissory note is a written contract within the meaning of this rule, and can no more be contradicted, added to, taken from, varied or explained, than can any other character of written contracts.

In 2 Parsons on Bills and Notes, 510, the rule is thus stated: "If the defendant endeavors to prove an oral bargain between himself and the plaintiff which differs in its terms from the written note, it will be remembered that it is a firmly settled principle that the parol evidence of an oral agreement, alleged to have been made at the time of the drawing, making or indorsing the note or bill, cannot be permitted to vary, qualify, or contradict, add to, or subtract from, the absolute terms of the written contract. The exceptions to this rule are cases of fraud, illegality, or want of consideration." On page 507 of the same work, it is further said, that "parol evidence of the contemporaneous agreement that a note in the usual form was intended to stand in place of a receipt, and that the sum for which it was given was intended as payment of a previous debt of defendant's father, is not admissible;" and on page 525 of the same author, it is said, that "in the case of a note in the usual form and regularly delivered, parol evidence cannot be admitted to prove any special purpose directly repugnant to the terms of the note."

The Supreme Court of Iowa in the case of Dickson v. Harris, 13 N. W. 335, held that a defendant while admitting that he executed a promissory note with full knowledge of its terms, could not, by parol contemporaneous testimony, transform such note into a memorandum or receipt for money paid.

The same doctrine has been decided by this court in the case of Jones v. Shaw, 67 Mo. 667, where it was

held that parol evidence was not admissible for the purpose of showing that a promissory note, absolute in its terms, was only intended as evidence of the amount of money which had been advanced by the plaintiff to aid in carrying on a partnership business, and which it was agreed, was to be returned to plaintiff only in the event the business should turn out prosperously.

The same is stated in Smith v. Thomas, 29 Mo. 307; Bunce v. Beck, 43 Mo. 266; and Woodson, Executor, v. Ritchie, 36 Mo. App. 506.

According to the law as announced by the authorities before cited, the action of the trial court in admitting parol evidence tending to prove that the loan of $20,000 made by the plaintiff bank was, as a matter of fact, made to the defendant bank, or to Baird, for its use and benefit, and not to Baird individually, as shown by the note, collateral contract and contract of guaranty read in evidence, was clearly erroneous and should have been excluded.

If the court had excluded this parol evidence, as clearly it should have done, then the written agreement between the parties would have been all the evidence left in the case, and upon that evidence standing alone in the case, as it should, then there could have been no doubt but what the plaintiff, on that evidence, would not have been entitled to a recovery and in that view of the case, the defendant's demurrer to the evidence should have been sustained without it should be that the contract of guaranty signed by Mispagel, as cashier, would have authorized a recovery against the defendant.

Since, however, the undisputed evidence shows that the contract of guaranty, signed by Mispagel, as cashier, was accommodational and unauthorized by the defendant bank, or by its board of directors, it must be held to be null and void, under the statutes of the State and the decisions of this Court. [R. S. 1909,

secs. 1099 and 1112; Sprague v. Rooney, 104 Mo. 358; Board of Trade v. Brady, 78 Mo. App. 585; Bank v. Hughes, 62 Mo. App. 576, l. c. 581 to 584; Chew v. Ellingwood, 86 Mo. 260; Savings Ass'n v. Sailor, 63 Mo. 24; Hume v. Eagon, 83 Mo. App. 576; Vansandt v. Hobbs, 84 Mo. App. 628; Bacon, Dawson & Co. v. Bank, 79 Mo. App. 406; Powers v. Woolfolk, 132 Mo. App. 362; Downing v. Ringer, 7 Mo. 585, 586; Rothwell v. Gibson, 121 Mo. App. 279; Tiedeman on Commercial Paper, section 116; 1 Amer. and Eng. Ency. Law (2 Ed.), 348; Morse on Banks and Banking (3 Ed.), sec. 65; 5 Cyc. 523; Fort Dearborn National Bank v. Seymore, 72 N. W. 724.]

If the law as thus announced is applied to this case, and is enforced, then there is no theory under the sun upon which the plaintiff is entitled to a recovery regardless of the form of action.

If this is not the law, then, as suggested by counsel for defendant, "if a party to a written contract, unambiguous in its terms, brings suit on the contract, he will not be permitted to contradict or vary its terms by oral evidence; but if he will just change the form of his action to a common count in assumpsit or for money had and received, he may recover on the same transaction to which the written contract relates, and by oral evidence may freely contradict or vary the terms of the written contract to suit the emergencies of his case."

In oral argument counsel for plaintiff contended that the law did, in certain cases, tolerate just what counsel for defendant state in the foregoing suggestions, and referred to actions to recover on a *quantum meruit*. While that is true, yet the principle underlying that class of cases has no application whatever to this case. Those cases are based upon the theory that where one person has performed labor, or furnished materials, under a contract, either written or oral, to another, and that other has accepted and re-

tains the same, then equity and good conscience re-
quire that he pay the laborer or materialman what
the labor and materials are reasonably worth, not to
exceed the contract price. But, notwithstanding that
fact, where the contract in such a case is in writing,
the written contract cannot be contradicted, added to,
taken from, or explained, any more than if the ques-
tion of *quantum meruit* was not in the case.

This rule has been well stated by this Court in
the case of Mansur v. Botts, 80 Mo. 651. In that case
the defendant, under a special contract, employed
the plaintiff to represent him in two law suits pending
in the circuit court of Linn county. After having fully
performed the services according to the terms of the
contract, the plaintiff instituted a suit, not upon the
contract, but for *quantum meruit.* The defendant an-
swered, and pleaded the contract, and charged divers
breaches thereof; also that the plaintiff caused the
defendant to lose said cases in the Linn Circuit Court,
on account of his default, negligence and unskillful-
ness in the management and trials thereof, to his dam-
age, etc. A promissory note also figured in the case,
but it is not material to the question here presented,
and for that reason will not be further noticed. At
the close of the plaintiff's case, the defendant asked
the court to instruct the jury that the plaintiff could
not recover on a *quantum meruit,* where the evidence
showed that the services were performed under a spe-
cial contract. In discussing that question the court
used this language: "The principal question dis-
cussed by counsel in their briefs is, as to whether the
court erred in permitting proof by plaintiff of the spe-
cial contract. Defendant contends that it was a clear
departure from the issues tendered in the pleadings;
that the action being on an account, as for a *quantum
meruit,* it, in effect, said there was no special contract
as to any part of the services rendered. It is a rule
of the common law long established, that *indebitatus*

*assumpsit* will lie to recover the stipulated price due on a special contract, where the contract has been fully executed, and it is not necessary in such case to declare upon the special contract. [Bank of Columbia v. Patterson, 7 Cranch, 299.] In Chesapeake & O. C. Co. v. Knapp, 9 Pet. 565, Mr Justice McLean very succinctly stated the rule thus: 'There can be no doubt that where the special contract remains open the plaintiff's remedy is on the contract, and he must set it forth specially in his declaration. But if the contract has been put an end to, the action for money had and received lies to recover any payment that has been made under it. . . . But if the contract remain open, the plaintiff's demand for damages arises out of it, and then he must state the special contract, and the breach of it. It is a well-settled principle, where a special contract has been performed, that a plaintiff may recover on the general counts.' So in Dermott v. Jones, 2 Wall. 9, Mr. Justice Swayne says: 'While a special contract remains executory, the plaintiff must sue upon it. When it has been fully executed according to its terms, and nothing remains to be done but the payment of the price, he may sue on the contract, or in *indebitatus assumpsit,* and rely upon the common counts. In either case the contract will determine the rights of the parties.' This may be considered as the generally accepted doctrine. [Felton v. Dickinson, 10 Mass. 292; Knight v. New Eng. W. Co., 2 Cush. 271.] Nor can it be maintained, as suggested, that there is anything in the provisions of our code of practice which renders the rule inapplicable in this State. For in Stout v. St. Louis Tribune Co., 52 Mo. 347, this court declared the common law rule in all its force, as above stated. This point is, therefore, ruled against the appellant.''

In Williams v. Railroad, 112 Mo. 463, l. c. 491, this court said: ''Now while it is perfectly clear that, in a suit on the contract, this was necessary be-

fore they could go into the measurements made by engineers, not named in the contract, it is urged upon us that plaintiffs had a right, under their second count of *quantum meruit*, to recover the value of their work and materials. At common law, a party could sue *in assumpsit* to recover the stipulated price due on special contract where the contract had been fully executed, and nothing remained to be done but the payment of the agreed price. [Mansur v. Botts, 80 Mo. 651; Chesapeake & O. Canal Co. v. Knapp, 9 Peters, 565; Dermott v. Jones, 2 Wall. 9.] In such a case he does not repudiate the contract, nor seek to avoid it, but, under his common count of *quantum meruit,* he offers the contract in evidence to sustain his case, and his proof of compliance with its terms. Nor does this necessarily work injustice, as might at first appear.''

The same doctrine is announced in Stout v. St. Louis Tribune Co., 52 Mo. 1. c. 346. On page 346 and 347 this court said: ''It is insisted by the plaintiff in this case, that his suit was not brought on the contract read in evidence, but was simply an action on an account to recover for the value of the services rendered, and that therefore he was not bound to show that the defendants were liable to pay under the provisions of the contract. It is very true, that where work is done or services performed under a special contract, and the plaintiff had fully performed the contract on his part and nothing remains but a duty on the part of the defendant to pay the price agreed on, the plaintiff is not in such case bound to sue on the written contract, but may use the common counts in assumpsit, but still when the contract is produced on the trial; the plaintiff will be required to prove that he has performed the contract on his part, and that by virtue of the provisions of the contract, the defendant is required to pay the price agreed on; if any fact, necessary to create a liability on the part of de-

fendant to pay, is wanting, the plaintiff cannot recover.''

These authorities make it perfectly plain that this last contention of counsel is unsound, and that the law is not, that where parties have put their contracts in writing they may, by changing the form of the action, put aside the written contract, vary its terms, add to or subtract therefrom by parol evidence. Such is not and cannot be the law, for the reason that it would nullify and set for naught the wise rule which prohibits the admission of parol testimony to contradict, vary, add to or subtract from the terms of a written contract.

But if it should be held that such is the law, then the wisdom of reducing contracts to writing becomes farcical in the extreme.

II. It is next insisted by counsel for plaintiff, that the finding and judgment on the first count of the petition was proper, ''because the defendant ratified and adopted the unauthorized guaranty, by collecting, retaining and appropriating the proceeds of the certificates of deposit, issued to it by plaintiff, after full knowledge that such certificates had been obtained on the strength, and by the means of the guaranty.''

In support of this insistence, we are cited to many authorities. Among others are Bank v. Lyons, 220 Mo. 538; Donnell v. Bank, 80 Mo. 165; People's Bank v. National Bank, 101 U. S. 181; First National Bank v. Bank, 109 N. W. 61; Auten v. Bank, 174 U. S. 125.

Clearly these cases are inapplicable to the facts of this case. They proceed upon the theory that a bank as such has power to borrow money, and that it did so, but in a manner prohibited by law; but having recovered the proceeds of the loan and retained them, the law will compel the repayment of the money in a suit, not upon the note, but for money had and received, notwithstanding the illegal form of the loan.

For instance, in the case of Bank v. Lyons, supra, the cashier of the Middleton Bank, of which Lyons was the receiver, without authority of the board of directors, but in violation of sections ·1281 and 1294, Revised Statutes 1899, which provide that the cashier or other officer of the bank shall have no authority to make or issue bills payable or to rediscount them without the consent of the board of directors, borrowed from the plaintiff bank, for the use of the defendant bank, the sum of $10,000, and issued bills payable therefor on the latter bank, by him as cashier. Said bills not having been paid when due, suit was brought by the former bank against the latter for money had and received. The defense was, that the cashier had no authority to borrow money upon said bills, and that they were therefore null, and void, and that the money could not be recovered by the lending bank, against the borrowing bank, because of said statutes. After an exhaustive review of the authorities, the court held that while the bills payable issued by the cashier for the $10,000 borrowed were null and void, and that a recovery could not be had upon them, nevertheless, since the bank had authority to borrow money, but not in the manner resorted to in that instance, it must repay it upon the ground that it would be unjust and inequitable to allow the defendant to plead the illegality of the bills upon which it received the money, and still retain the money obtained thereby.

The ruling there announced was correct, and is supported by the consensus of opinion throughout the country. But that is not this case. The cashier of the St. Charles Bank never borrowed from the Third National Bank the $20,000 mentioned in the evidence, for himself or for the St. Charles Bank. He only undertook to guarantee for his bank a loan the Third National made to Baird, who received the proceeds of the loan and paid or turned them over to the St.

Charles Bank in payment of a portion of his indebtedness to it (which was clearly in violation of said statute). The difference between the two cases is this: In the Lyons-Bank case, the bank itself borrowed and received the money and retained and used it, but in the case at bar the St. Charles Bank never received the money of or from the Third National, but received it from Baird, who borrowed the same from the latter and who had a perfect legal right to pay and did pay it to the former bank in the discharge of so much of his indebtedness to it.

Suppose under exactly the same facts that exist in this case, Baird, instead of paying the $20,000 to the St. Charles Bank, had paid it to some other creditor, would it be seriously contended that the plaintiff could recover the same from either the St. Charles Bank, on the guaranty, or from such other creditor simply because it received the money? I apprehend not. Yet there is no difference in principle between the two cases.

The mere fact that Mispagel attempted, as cashier, to guarantee the payment of Baird's note to the Third National, does in no manner militate against the rule just announced. He had no authority, legal or moral, to sign the name of the St. Charles Bank to the contract of guaranty, and the plaintiff knew that fact as well as did the officers of the St. Charles Bank.

While statements and representations made by the cashier of a bank in the ordinary course of business are binding upon the bank, yet when he is transacting business which is outside and beyond his duties and authority as such cashier, his conduct, representations and statements are not binding upon the bank. [Bank v. Froman, 129 Mo. 427, l. c. 430; Bank v. Lovitt, 114 Mo. 519, l. c. 525, 526; Benton v. Bank, 122 Mo. 332, l. c. 339, 340; Traber v. Hicks, 131 Mo. 180, l. c. 192; Hickman v. Green, 123 Mo. 165, l. c. 176; Keyser v.

Hinkle, 127 Mo. App. 62, 1. c. 73; Smith v. Boyd, 162 Mo. 146, 1. c. 157.]

I am unable to understand how it can be contended, in the light of these authorities, that Mispagel and Baird were representing the St. Charles Bank, while borrowing this $20,000 from the Third National, with which to cover up their crime and shortage with the St. Charles Bank, especially when it had no knowledge of the shortage or of this loan made to Baird.

I am, therefore, clearly of the opinion that the plaintiff was not entitled to recover upon the first or upon any other count in the petition.

III. It is also contended that equity may look beyond the mere form of a transaction and deal with its substance, and by applying that rule to the case at bar, it will be seen and must be held that the St. Charles Bank was the real borrower of the $20,000, and not simply a guarantor as the contract of guaranty read in evidence indicated.

In answer to that, I wish to state that this is not a suit in equity, nor is the character of that contract assailed in the pleadings. It is pleaded and relied upon as a contract of guaranty, and the court below, at the instance and request of the plaintiff, held it valid as such, and rendered judgment thereon for the plaintiff.

Moreover, this contention ignores the well-settled principle of law which prohibits the reformation of a contract, except where the suit is for that purpose, and where the evidence shows clearly that the contract as executed does not express the true agreement of the parties. But this suit is not of that character, nor was there a scintilla of evidence introduced which tended to show that the contract of guaranty did not express the real intention of the parties; and even if it had been introduced it would have been clearly inadmissible, for the reason that a written contract can-

not be contradicted, changed, added to or subtracted from by parol testimony.  See cases previously cited upon this point.

This contention is also unsound, and should be ruled against the plaintiff.

IV.   There are several other points made and discussed by counsel, for both parties, but in my opinion they are subsidiary to those considered; and what is here said would, if applied to them, confirm the conclusions before stated; but the lack of time prevents further discussion of a lost but a just and meritorious defense to this unjust action.