## GATE CITY NATIONAL BANK, Appellant, v. MINERS & FARMERS BANK.

### Division One, June 30, 1914.

1. **BANKING: Loans to Individual: Money Received by Bank.** Where plaintiff bank loaned to the cashier of the Merchants Bank and received the individual note of the cashier indorsed by certain of its directors, and as collateral security notes that had been the property of said Merchants Bank, indorsed by its directors and cashier, first generally, and later without recourse, the Merchants Bank, although it received the money and it was passed to its credit, is not liable to plaintiff for the amount of the loan, it being understood at the time and repeatedly openly avowed afterwards by plaintiff that said Merchants Bank did not owe it anything. Nor was said Merchants Bank, or its assignee, liable for money had and received.

2. **————: ————: ————: Counterclaim: Appropriation of Deposit.** And where plaintiff bank appropriated a deposit made with it by said Merchants Bank and credited it on the said individual note of said cashier, so indorsed by its directors, the Merchants Bank itself not being chargeable with the money received by it when said cashier's note was accepted for the loan, the Merchants Bank, or its assignee for value, when sued for the balance of said loan, is entitled to a counterclaim for the amount of the deposit so appropriated by plaintiff bank.

3. **————: ————: ————: Assignment.** And the Merchants Bank not being liable, the question of whether a certain instrument of assignment to defendant bank, by which defendant assumed to pay the creditors of said Merchants Bank, was valid, becomes immaterial; for if the assignor never was liable, its assignee cannot be.

4. **PRACTICE: Demurrer to Evidence: Overruled: Proper Judgment for Defendant.** If the plaintiff made no case for the jury and the court should have sustained defendant's demurrer to the evidence, yet if the verdict for defendant was right, all questions relating to the way the case was put to the jury become unimportant, provided plaintiff was allowed its competent evidence.

5. **EVIDENCE: Competency: Objection.** An objection to evidence which was not made at the trial cannot be considered on appeal.

Appeal from Dade Circuit Court.—*Hon. B. G. Thurman*, Judge.

AFFIRMED.

*McNatt & McNatt, R. B. Caldwell* and *McCune, Harding, Brown & Murphy* for appellant.

(1) The Merchants Bank borrowed the money. Any evidence of admissions of the officers of the bank subsequently made that they were not looking to the Merchants Bank for payment was inadmissible. Gillespie v. Bank, 20 Okla. 768; Bank v. Steward, 37 Me. 519; Bank v. North, 41 N. W. 736; Hazleton v. Bank, 32 Wis. 34; Goetz v. Bank, 119 U. S. 551; LaRue v. St. Anthony, 54 N. W. 806; McDermott v. Company, 73 Mo. 516; Adams v. Company, 74 Mo. 553. (2) Defendant bank having taken over all of the assets of the Merchants Bank and having agreed to pay its obligations, became liable for the debt of plaintiff. Crone v. Stinde, 156 Mo. 262; Porter v. Woods, 138 Mo. 539; Beattie v. Gerardi, 166 Mo. 142.

*Neale & Newman, J. B. McGriffin* and *I. V. McPherson* for respondent.

Defendant was entitled to recover, and the court erred in refusing to direct a verdict for it. (1) The contract of purchase was not made for plaintiff's bene-

fit as its object, and it was not the party intended to be benefited. Bank v. Chick, 156 S. W. 743; Porter v. Wood, 138 Mo. 539; Howsmon v. Water Co., 119 Mo. 304; Hill v. Railway, 82 Mo. App. 188; Armstrong v. School District, 28 Mo. App. 180; State ex rel. v. Loomis, 88 Mo. App. 500; Lawrence v. Fox, 20 N. Y. 268; Vrooman v. Turner, 69 N. Y. 283; Scheele v. Bank, 120 Mo. App. 622; Ellis v. Harrison, 104 Mo. 278; Crow v. Lewin, 95 N. Y. 423. (2) The proof conclusively established that the contract declared on in plaintiff's petition was never made, but that the contract as made and entered into was altered in a material particular by which the same was rendered void. Plaintiff sues under the contract as altered. Therefore the burden was upon the plaintiff to show that the corporation ratified the alteration in its contract before the same was properly receivable in evidence, or could be the basis of recovery by the plaintiff. Cox v. Mignery & Co., 126 Mo. App. 682; Harrison v. Lakenan, 189 Mo. 603; Morrison v. Garth, 78 Mo. 434. The consent of the individual members of the board is not sufficient to validate the alteration. Directors of a corporation can bind it only by acting together as a board. The separate assent of a majority of the board obtained when they were not regularly convened and acting together as a board is not binding on the corporation in the absence of subsequent ratification; since, when they are not consulting as a board, they are regarded as acting privately and unofficially. 10 Cyc. 774. (3) Plaintiff was not entitled to recover and the court erred in refusing to direct a verdict for the defendant for the reason that plaintiff admitted that it accepted the original note of Sparks for the money loaned; that it afterwards surrendered that note and accepted the note of Sparks and four other directors of the bank; that it held this note secured by the Loy and Boyer collateral and was suing on and endeavoring to enforce the same at the time of bringing the suit and of the trial of this case.

The rule is that although the giving of a note in set-
tlement of an account does not extinguish the original
cause of action but only suspends it, yet where the note
is thus given the creditor cannot recover on the original
cause of action without producing it at the trial or
offering to surrender and cancel it. Steamboat v.
Lumm, 9 Mo. 64; McMurry v. Taylor, 30 Mo. 263; Ap-
pleton v. Kenyon, 19 Mo. 640; Doebling v. Loss, 45 Mo.
150; Howard v. Jones, 33 Mo. 583; Brooks v. Mastin,
69 Mo. 58; Greebe v. Style, 61 Mo. 473; Holland v.
Rongey, 168 Mo. 19; Scheplin v. Dessar, 20 Mo. App.
574; O'Bryan v. Jones, 38 Mo. App. 94; Howard &
Sherley v. Hawkins, 75 Mo. App. 150; Bertiaux v.
Dillon, 20 Mo. App. 603; Harvester Co. v. Blair, 146
Mo. App. 379; Book Co. v. Corbett, 162 Mo. App. 73;
Dowdy v. Dowdy Est., 118 Mo. App. 341. (4) Upon
the admissions in the record plaintiff was estopped
from asserting its demand against the defendant.
Bank v. Reichart, 101 Mo. App. 252. This is so because
the plaintiff had accepted the note of Sparks secured
by the indorsement of the directors and by the collat-
eral, and had thereafterwards persuaded and induced
the Miners & Merchants Bank to pay the individuals
whose notes it held for having procured the money
sued for from plaintiff for the Merchants Bank, and
had induced the Merchants Bank to part with the title
to $10,000 worth of its paper. Scheplin v. Dessar, 20
Mo. App. 574; Bank v. Frame, 112 Mo. 502; 16 Cyc.
777-778.

LAMM, J.—Plaintiff bank sued defendant bank in
the Lawrence Circuit Court for money loaned. Going
to the Dade Circuit Court on change of venue in a
trial to a jury plaintiff was cast, and, defendant recov-
ering on a counterclaim, plaintiff comes up by appeal.

The petition was in two counts and there is such a
tangle of complications that the case on appeal will
proceed more understandingly by reproducing the first

count, pointing out wherein it differs from the second and giving a summary of the answer.

The first count reads:

"Now comes plaintiff and states that at all times hereinafter complained of it was, and is, a corporation organized under the acts of Congress of the United States, doing a general banking business in Kansas City, Missouri; that at all times hereinafter complained of the Miners & Merchants Bank was, and is, a corporation, organized under the laws of the State of Missouri, and that prior to November 13, 1909, the said Miners & Merchants Bank was doing a general banking business in Aurora, Missouri; that on or prior to November 13, 1909, the Miners & Farmers Bank, defendant herein, was organized as a corporation under the laws of the State of Missouri, and that on November 13th, or about that date, 1909, said defendant began doing a general banking business as such corporation in Aurora, Missouri.

"Plaintiff for its first cause of action herein states that on or about July 9, 1909, the Miners &.Merchants Bank of Aurora, Missouri, borrowed from this plaintiff and this plaintiff loaned to said Miners & Merchants Bank the sum of $10,776.53. Plaintiff states that on or about November 12, 1909, a portion of the said sum so borrowed by the said Miners & Merchants Bank had been paid and that on November 13, 1909, said Miners & Merchants Bank was indebted to this plaintiff in the sum of $9,615.17.

"Plaintiff states that on or about November 13, 1909, the Miners & Farmers Bank, a corporation as aforesaid, made an alleged purchase and took possession of the assets of the Miners & Merchants Bank aforesaid, including its banking house, its furniture and fixtures, its bills receivable, notes receivable, commercial paper of all sorts and all other assets, including the good will of said Miners & Merchants Bank, and, as a part of the same transaction, and as a consideration

for the above assets received by it, the said Miners & Farmers Bank assumed and agreed in writing to pay the debts of the said Miners & Merchants Bank, not including its debts to stockholders. Plaintiff states that the said agreement was included and stated in the bill of sale given by the said Miners & Merchants Bank to the said Miners & Farmers Bank, a copy of which said instrument is hereto attached and marked 'Exhibit A,' and made a part hereof.

"Plaintiff states that the agreement on the part of said Miners & Farmers Bank to assume all debts and liabilities of the said Miners & Merchants Bank is further evidenced by a written instrument executed by the said Miners & Farmers Bank and delivered to the said Miners & Merchants Bank, a copy of which said instrument is also attached hereto, marked 'Exhibit B,' and made a part hereof.

"Plaintiff states that the Miners & Farmers Bank continued business at the location formerly used by the Miners & Merchants Bank, and became to all intents and purposes its successor, and by reason of all of the said facts aforesaid the Miners & Farmers Bank became indebted, on or about November 13, 1909, to this plaintiff in the sum of $9615.17.

"That on or about March 3, 1910, this plaintiff demanded of defendant payment of the sum then due on the said loan, which said payment was by the defendant refused.

"Plaintiff further states that on said last mentioned date the defendant had on deposit with this plaintiff the sum of $1054.56; that upon the refusal of said defendant to pay said sum which it was then owing to this plaintiff, plaintiff debited the account of this defendant in the said sum of $1054.56, and credited the same on the debt of defendant hereinbefore mentioned.

"Plaintiff states that there was, on or about March 3, 1910, a balance due this plaintiff from defendant in

the sum of $8732.60 and interest thereon from said date, which said balance is still due, has been demanded and is still unpaid.

"Wherefore, plaintiff prays judgment against defendant in the sum of $8732.60, together with interest thereon from said date and its costs in this action expended."

The second count has some allegations germane to (or squinting at) a cause of action for money had and received, and some others faintly suggesting a cause of action in equity, but the gravamen of the matter is the same as that of the first count, to-wit, a cause of action on two contracts, first, a contract evidencing money loaned to the Miners & Merchants Bank by plaintiff and, second, a contract of assumption of payment on the part of defendant bank. We give a summary of it, *viz.*: After alleging the same loan to and the same indebtedness on the part of the borrowing bank, it has this allegation:

"Plaintiff states that on or about November 13, 1909, the same persons who were then directors and stockholders of the Miners & Merchants Bank organized a corporation known as the Miners & Farmers Bank; that the stockholders in said Miners & Farmers Bank were almost the identical persons who composed the stockholders in said Miners & Merchants Bank."

It next makes the same averments in the first count of a transfer, conveyance and delivery by the Miners & Merchants Bank to the Miners & Farmers Bank of all the property and assets of the former, together with its good will, bills receivable, commercial paper of all sorts, etc., on the same consideration, to-wit, an agreement to pay the debts and liabilities of the selling bank, except stockholders. But the date of the transfer and assumption is put as of March 3, 1910, instead of on or about November 13, 1909, as in the first count. Then follows the following paragraph:

"Plaintiff states that at the time of making said transfer the Miners & Merchants Bank was indebted to this plaintiff in the sum hereinbefore set out; that the organization of the Miners & Farmers Bank and the taking over by it of the assets of the Miners & Merchants Bank was done with knowledge by it of all the facts hereinbefore set out, and with knowledge of the further fact that it (said Miners & Farmers Bank) was taking all of the assets of said Miners & Merchants Bank; that said transaction would leave the Miners & Merchants Bank no assets with which to pay its debts, and that it would make said Miners & Merchants Bank unable to pay the debt it owed this plaintiff hereinbefore referred to, and prevent the collection of said debt by plaintiff from said Miners & Merchants Bank.

"Plaintiff states that the proceeds of said loan which were made by this plaintiff to the Miners & Merchants Bank on or about July 9, 1909, hereinbefore referred to, were received and accepted by defendant Miners & Farmers Bank on or about November 13, 1909, when it took possession of the assets of the said Miners & Merchants Bank, and that the benefit of said loan has enured to this defendant the same as if the loan had originally been made to defendant. By reason of the facts hereinbefore set out the Miners & Farmers Bank became indebted to this plaintiff, on November 13, 1909, in the sum of $9615.17."

In the rest of the second count appear the same demand of payment from defendant of said balance of indebtedness, the same appropriation of defendant's deposit on March 3, 1910, together with demand of judgment for the balance remaining after such appropriation as in the first count.

The answer is voluminous and, as said, a summary will do. It admits the incorporation of the three named banks; denies the loan by plaintiff to the Miners & Merchants Bank; avers the loan actually made was to certain individuals, namely, Sparks, Robertson, Reed,

Ruppel, Crumpley. It then sets forth a list of notes, among them one given by Boyer for the rise of $3500, and a Loy note for the rise of $6000 (aggregating more than the loan) and the indorsement and hypothecation of said notes by said individuals over to plaintiff as security for the money so loaned. It admits the money loaned to said individuals was put to the credit of the Miners & Merchants Bank and avers that the latter bank became indebted to the said individuals for such money; that the notes so pledged as security belonged to the Miners & Merchants Bank and were pledged without the authority of its board of directors given in writing as required by statute; that the banking department of the State on discovery of such wrongful hypothecation commanded plaintiff to return, and plaintiff did return, said notes to the Miners & Merchants Bank; that thereupon plaintiff disavowed any liability on the part of the Miners & Merchants Bank for the loan made to such individuals and so secured, and avowed and stated that it looked solely to such individuals for repayment and that the Miners & Merchants Bank owed said individuals on account of the transaction and not plaintiff; that thereupon the matter was adjusted on the advice and persuasion of plaintiff in this way, to-wit: The Miners & Merchants Bank was persuaded to pay said individuals by transferring and selling to them all the notes so as aforesaid wrongfully hypothecated in the first instance as and for a payment and settlement of the liability of the bank to them, said Miners & Merchants Bank being assured by plaintiff that it looked solely to such individuals for the money loaned by it; that such notes so wrongfully hypothecated in the first instance by said individuals were indorsed over to them and the original hypothecation was validated by re-endorsing them over to plaintiff and again pledging and hypothecating them as security for the original loan of the money sued on in this suit. Wherefore defendant invokes estoppel against plain-

tiff's claiming any indebtedness of the Miners & Merchants Bank to it.

The answer after recapitulating the premises, next avers that the notes so pledged were secured by real estate of the value of $10,000, and that plaintiff had brought suit on the "note of said individuals" and had attached property to enforce collection thereof and this fact is pleaded as an additional element of estoppel.

Coming to the alleged contract of assumption, the answer denies that defendant agreed to pay *all* the debts of the Miners & Merchants Bank. The petition having attached thereto an exhibit said to be the contract of purchase and assumption, the answer denies specifically that defendant executed it as pleaded.

(Note: The answer is verified by affidavit.)

By way of counterclaim the answer next alleges, in substance, that defendant had on deposit in March, 1910, $1197.38 with its correspondent, plaintiff bank, subject to draft and check; that it drew a draft on — day of March, 1910, for $1000, in favor of a named bank in St. Louis against said sum, but plaintiff "wrongfully, maliciously and wantonly" dishonored the draft, protested the same and appropriated and converted to its own use the whole of defendant's deposit, whereby the defendant was actually damaged in said sum, and by the reckless, willful and wanton dishonor of the draft was injured in its credit and financial standing and in the confidence and credit of its depositors and on account thereof depositors had withdrawn their deposits from defendant to its damage in the further sum of $1000, making its loss the actual sum of $2197.38. It asks judgment for that sum, together with punitive damages in the sum of $2000 for the wanton, willful and reckless wrong.

(Note: There was no testimony upon which punitive damages could rest, nor was there any testimony directed to loss of deposits or confidence of customers,

nor was any such issue put to the jury by instructions—
the verdict of the jury on the counterclaim was confined
to defendant's money actually appropriated by plain-
tiff.)

One of appellant's contentions is error in respond-
ent's instructions. Respondent seeks to parry the force
of that contention by one of its own, to-wit, that plain-
tiff on the facts as a matter of law made no case for
the jury. The material facts will appear in connection
with a determination of respondent's contention on
that head. The questions raised group themselves log-
ically under the following general heads:

(1) Did plaintiff make a case for the jury?

(2) If so, was there reversible error in refusing
instructions for plaintiff or in giving them for de-
fendant?

(3) Or was there reversible error in ruling
against plaintiff on the admission of evidence?

I. *Did the plaintiff make a case for the jury?*

The case on the facts is this: Plaintiff is a na-
tional bank domiciled at Kansas City. For conveni-
ence we will call it "plaintiff" throughout this opinion.
Throughout the year 1909 and for a long time prior
thereto there was a State bank in Aurora, Missouri,
called the Miners & Merchants Bank of Aurora, with
a capital of $15,000. For convenience it will be called
the "Merchants Bank." Its cashier was one Sparks.
Shortly before the 12th of November, 1909, there was
organized in the town of Aurora another State bank
known as the Miners & Farmers Bank of Aurora, with
a capital of, say, $25,000. This is the defendant bank,
and for convenience, because of a similarity of names
with the Miners & Merchants Bank, it will be called
the "defendant" throughout this opinion. The Mer-
chants Bank, as the sequel showed, was wrecked by
Sparks, its cashier, through the inattention or lack of
judgment of its board of directors. It had been a

259 Mo.—36

county depositary and in the summer of 1909 another bank, known as the "Bank of Aurora," was successful bidder as such depositary. It was in hard lines and not able to meet the withdrawal of the county deposits without borrowing. Accordingly on July 2, 1909, at the regular monthly meeting of its board of directors, the following resolution was passed: "On motion which was carried the board hereby authorizes the cashier to borrow $10,000, if needed for the use of this bank, and is empowered to hypothecate the notes or other securities of this bank if necessary in obtaining the same."

It is contended by plaintiff that the foregoing order is the basis of the authority in the Merchants Bank to borrow from plaintiff the money in suit. *Contra,* it is contended by defendant that such order is the authority upon which the Merchants Bank borrowed $10,000 from another then existing bank in Aurora, to-wit, said Bank of Aurora. What actual use was made of said order by cashier Sparks, if any, is entirely dark. It does not appear that plaintiff during the times in hand knew of the existence of the order. Neither does it appear that the Bank of Aurora knew of its existence. Some of the officers of plaintiff testified, the officers of the Bank of Aurora did not, neither was Sparks called as a witness on that or any other issue. It is not amiss to follow the Bank of Aurora incident. Four days later the Merchants Bank borrowed $10,000 from the Bank of Aurora on the following note:

> $10,000.00                    Aurora, Mo., July 6th, 1909.
>
> On demand after date, for value received, we or either of us, promise to pay to the order of Bank of Aurora, at its banking house, Ten Thousand Dollars, with interest at the rate of five per cent per annum after date.
>
>                    MINERS AND MERCHANTS BANK,
>                         By W. P. SPARKS, *Cashier.*

Appended to that note was a conventional collateral security pledge of certain notes of the Merchants

Bank. The principal note was paid off by partial payments on July 7, and August 21, 1909. A bank examiner testified in the instant case that said $10,000 note due the Bank of Aurora was in fact the loan contemplated by the aforesaid order authorizing the borrowing of that sum and so entered on the minutes of the Merchants Bank on July 2, 1909. The fog hanging over that transaction was not lifted otherwise than as indicated.

The correspondent of the Merchants Bank at Kansas City was plaintiff, and Cashier Sparks was well known to plaintiff's officers. The facts are faintly outlined, but enough appears on the record to show that plaintiff knew the Merchants Bank was in financial trouble in the fore part of the summer of 1909. Early in June (plaintiff's vice-president, Pollard, says about the first) Sparks appeared in Kansas City to procure funds to tide over the troubles of the Merchants Bank. He explained that his bank had lost the county's money, that its deposits would decrease and that he would have "to discount some paper or borrow some money" for the bank. The record is no little confused, but we get the impression that the vice-president of plaintiff promised aid, adopting Sparks's plan in extending it; that Sparks disclosed to him that he did not want the books of the Merchants Bank to disclose such a loan, but that he wanted to make "a direct paper" signed by the directors, and plaintiff's vice-president says that was the plan agreed on. It seems that Sparks left Kansas City understanding the arrangement to contemplate a mere rediscount of some bills receivable held by the Merchants Bank and that the signature of the directors as indorsers on such rediscounted paper was to evidence their individual liability thereon. It seems furthermore that Sparks understood that in order to get aid he was to make a showing by way of financial statement from these indorsing directors of their property and of the credit they were entitled to. Accord-

ingly on June 23, 1909, he sent plaintiff the financial statements of the proposed indorsing directors and wrote a letter to plaintiff's vice-president, which, so far as material, reads:

> Dear Sir:—
> Enclosed herewith I hand you statements of the directors who will endorse the paper I expect to send you for credit as per previous arrangement.
> I will get the board together Friday and select the paper and get same out Saturday.
> Some of the members have been away for a few days, and at this time of the year I have a hard time getting them together.

Following that letter on July 3, he sent the indorsed notes for discount and wrote the following letter to plaintiff's vice-president:

> Dear Mr. Pollard:
> Enclosed herewith we hand you sundry customer's notes amounting to $10,776.53, which we ask you to please pass to our credit, less the discount of six per cent from July 6 to maturity of notes.
> We turn over the county funds next week, and this will give us sufficient money and also enable us to carry a good balance with you.
> Thanking you for the accommodation and favors extended,
> I remain,                          Very truly yours,
>                                     W. P. SPARKS, Cashier.

Between the dates of July 3rd and July 9th letters passed between Toothaker, cashier of plaintiff handling the transaction at the Kansas City end of the line, and Sparks, cashier at the Aurora end of the line. It seems Toothaker raised a question about the transaction taking the form of a mere rediscount, and he wanted a principal note back of the forwarded notes. He apparently understood the arrangement between his vice-president and Sparks to contemplate that form of a transaction and wrote to Sparks to that effect. Sparks readily forsook his plan and agreed to the

suggestion.   Accordingly on July 7, he sent plaintiff
such note with the following letter:

Dear Toothaker:—
    Your letter of the 6th to hand and fully noted.   As per
your request, I herewith hand you note duly signed and pay-
able on demand for $10,776.53.   You will note I have signed
as an individual, as the notes sent you are made payable to
bearer and indorsed by my directors individually, and we do
not wish to show this on our books as bills payable or redis-
count.   I trust this will be entirely satisfactory, as it meets
with your desire.   With kind personal regards, I remain,

                                    Very respectfully,
                                    W. P. SPARKS, Cashier.

That note was accepted by plaintiff as fully con-
summating the arrangement and the money was passed
on July 9, 1909, to the credit of the Merchants Bank.

It will be observed that plaintiff now held the in-
dividual note of Sparks, indorsed (as we gather) by
certain persons who happened to be directors of the
Merchants Bank.   It also held as collateral security for
Sparks's note a series of notes that had been the prop-
erty of the Merchants Bank, including one from Loy
and another from Boyer, and each of this list of notes
also bore the general individual indorsements of the
same persons who signed the principal note.   It will
also be observed that it was agreed that the books of
the Merchants Bank were to show no obligation of the
bank itself.   Accordingly the matter was consummated
on that basis.   The books of the Merchants Bank showed
no obligation outstanding and no liability on its part,
and there is nothing in this record to show that the
books of plaintiff showed any such obligation or any
such liability.   The latter's books do show, however,
as said, that the money was passed to the credit of the
Merchants Bank and also show it was presently paid
out on its drafts and checks.   When Sparks's note be-
came due early in November, 1909, it was cancelled by
the substitution of another for the amount of $9615.17,
but this note was the note of Sparks and the other

individual directors signing as payors.  In the meantime some of the collaterals had been paid and the Merchants Bank was used as a collecting agency, and it seems plaintiff credited the amount of these payments on Sparks's principal note.

Going back a little, the record shows other things had happened between times.  It seems in the summer of 1909 the banking department of the State was watching closely the affairs of the Merchants Bank.  It knew, as plaintiff had known all along, that the Merchants Bank was in a serious financial trouble.  One of its examiners noticed the absence of the Loy and Boyer notes from among the Merchants Bank's assets and learned those notes were held by plaintiff.  Fearing or suspecting a secret liability on the part of the Merchants Bank, not shown by its books, the banking department took open and avowed steps to ascertain the true facts.  One of its examiners early in August, say on the 2nd, visited plaintiff bank and interviewed its officers.  Some of its officers testifying have lapses of memory about that interview; but, keeping in mind what plaintiff's officers admitted and what they did not "remember" and what the bank examiner testified to, which is in nowise substantially contradicted, there is no doubt on this record that such officers assured the bank examiner that plaintiff held no obligation against the Merchants Bank, but looked solely to the individual note of Sparks and the directors and to the pledged collateral and made their loan on that basis.  The examiner, however, seems to have had doubts of the validity of the hypothecation  of the  Merchants Bank's notes so held as collateral.  He seems, too, to have feared that, as a matter of law, there might be a liability outstanding on the part of the Merchants Bank despite the counter-assurances of plaintiff's officers.  Spurred thereto by his fears and doubts he left Kansas City and appeared at Aurora the next day to continue his investigation.  On that same day, simul-

taneously with his appearance at Aurora, plaintiff's cashier, Toothaker, appeared on the scene. Strange to tell, the testimony of Toothaker is absent in this instant case. It does not affirmatively appear that Toothaker's visit to Aurora was prearranged with the bank examiner, but it does significantly appear that plaintiff knew the bank examiner was dissatisfied with the situation and knew that he was going to Aurora and would be there the next day. While the record is not as clear as it might be, yet it is plain enough that what happened at Aurora was this: Mr. Toothaker had in his possession the collateral hypothecated with plaintiff's bank. There is a suggestion on the part of one of plaintiff's officers that he went there to collect, to show that plaintiff "got busy," but he made no effort to "collect" from the payors of the notes and as the inability of the Merchants Bank to take up the paper was known, it is plain enough that what actually happened was within the authority of Toothaker to bring about, namely, first, an arrangement whereby plaintiff would be secured in its title to the collateral notes, and, second, an arrangement whereby the bank examiner would be satisfied that indeed and in truth the Merchants Bank stood clear of all liability. The getting "busy" mentioned took that turn and no other. The plan fallen on was this: A special meeting of the board of directors of the Merchants Bank was called on August 3, and at that special meeting (Toothaker and the examiner both present) the collaterals in question were ordered transferred to the indorsing directors, on the theory that the Merchants Bank owed *them* for furnishing it the money theretofore passed to its credit by plaintiff and procured in the way we have outlined. The directors' resolution itself was ruled out on plaintiff's objection and we reconstruct the transaction in the light of other admitted testimony and other facts. At that time these collateral notes bore only the general or blank indorsement of the di-

rectors. To effectuate the new arrangement the general indorsement of the individual directors was supplemented by one reading: "Without recourse on the Miners & Merchants Bank, Aurora, Missouri. W. P. Sparks, Cashier." And then Toothaker carried them back to plaintiff, and from that day to this plaintiff has claimed to own them as collateral security, either by virtue of the original arrangement by which they were pledged or by virtue of the modified arrangement made August 3, which was then supposed to be without any technical flaw and to evidence the following situation, to-wit: That the Merchants Bank owed plaintiff nothing; that it had ratified the original pledge of securities by going through the form of transferring them to the persons on whose credit the Merchants Bank secured the money, and by validating the prior pledge those persons had made of those bank securities to secure their own individual note.

We must again go back a little to pick up a thread of this uncommonly tangled affair. In July, 1909, say on the 27th, the Merchants Bank had been examined by a State examiner. Its books showed no liability whatever to plaintiff and it was on the strength of that examination and doubts arising thereon that another examiner appeared on August 2nd, as said, to pursue in Kansas City the investigation of the banking department by interviewing plaintiff bank, the upshot of which we have given.

To make clear precisely what happened when Toothaker appeared on the scene at Aurora on behalf of plaintiff, we go into the matter a bit deeper, thus: Toothaker said to all the assembled parties he was willing to do anything to fix the matter so as to show the Merchants Bank was not liable. By "assembled parties" we mean the bank examiner and all the directors of the Merchants Bank. All knew where the shoe pinched, and the bank examiner seems to have taken a directing hand in the matter. His position, expressed

to all, is indicated by the following uncontradicted testimony falling from him: ''I wanted a thorough understanding, so there could be no question raised in the future about this liability; that it was necessary to know whether there was a liability there, and I wanted this matter fixed so as to remove all question of liability.'' As said, it was *fixed* to the satisfaction of all at the time, and thereafter the department dealt with the Merchants Bank on the theory that bank's skirts were clean and it was clear of liability. It is plain enough, too, that plaintiff intended the department should so deal with the Merchants Bank.

Moreover, at about the time defendant bought out the Merchants Bank (a matter presently to be explained) which was done under the auspices of a State bank examiner, the State banking department demanded what is known as a ''reconcilement'' from plaintiff. This reconcilement sheet throws no uncertain light on the status of things. It seems that at the close of business on November 12, 1909, the Merchants Bank's books showed a balance of $1395.06 due it from plaintiff. Thereupon the banking department addressed a communication to plaintiff propounding certain questions and receiving certain answers. Three of these questions and the answers thereto made by plaintiff's cashier, Toothaker, were as follows:

1. Has your bank now under discount any bills receivable of the bank named, or any on which its official indorsement appears, or for which it is in any other way liable? If so, please furnish a list, giving names and amounts.
(Ans.) 1. No.

2. Does your bank now hold bills receivable or any securities belonging to the bank named, or any on which its official indorsement appears, or for which it is in any other way liable? If any are held, give list and state how they are held.
(Ans.) 2. No.

3. Are there any loans now outstanding by your bank to the bank named, or to any other party for which the bank is in any way liable? If so, specify character of loan—whether

upon bills payable, certificate of deposit, open account or otherwise. In each case specify amount, time, etc.

(Ans.)   3.   No.

So much for the record on the question of liability of the Merchants Bank to plaintiff for borrowed money.

We now come to that part of the record relating to a contract of assumption by defendant of a supposed indebtedness on the part of the Merchants Bank to plaintiff. It seems the entire capital of the Merchants Bank had been dissipated. It seems it owed in recognized bills payable and in recognized liabilities to its depositors about $14,000 more than the assets it proposed to transfer to defendant amounted to. Evidently it was impossible for it to go on.

Although plaintiff's petition in its second count expressly averred that the stockholders of defendant were "almost identical" with the stockholders in the Merchants Bank, yet defendant (on plaintiff's objection) was not allowed to show that its stockholders were different. But putting that to one side, early in November, 1909, defendant was organized and incorporated as a new bank with an authorized capital of $25,000. It bought out the Merchants Bank, so far as we can see, in the utmost good faith. There is no question but what its directors were not the same.

. We think it material to observe that the record discloses that the Merchants Bank made a list of its creditors to be paid, that its books showed its creditors and that plaintiff was not on such list or on its books. We think it material that the record shows the Merchants Bank made a list of its properties, to-wit, the assets and bills receivable it proposed to convey and assign to defendant and that the notes held by plaintiff as collateral security were not among them.

There is a serious dispute between counsel on the integrity and binding force of the written and signed memoranda evidencing the purchase on the part of defendant. In the first place the minutes of the defend-

ant show as part of defendant's sale and purchase memorandum, among other things, as follows:

> * * * and now, for and in consideration of the express agreement on the part of said Miners & Farmers Bank that it will assume and pay off the debts and liability of said Miners
>                     Creditors, Excepting stockholders,
> & Merchants Bank to its depositors in the sum of $40,860.17, and to further assume and pay off the following debts and liabilities of said Miners & Merchants Bank, as follows: One note to Holland Banking Co., of $4,500.00; two notes to Central National Bank of St. Louis, of $5,000.00 each; and one note to Bank of Aurora, for $4,500.00; and whereas, it is expressly represented to the Miners & Farmers Bank that the above and foregoing amounts include all and the only liabilities of said Miners Bank, except its liability to its stockholders; Now, therefore, it is hereby agreed by the Board of Directors of said Miners & Farmers Bank, that in consideration of the above premises and recitations, that it will assume and pay off the depositors and other creditors of said Miners and Merchants Bank to the amounts of said sums above set forth; and leaving the liability to the stockholders of said Miners & Merchants Bank, to be settled for and paid by its own Board of Directors.
>
> "In witness whereof, we, the undersigned, composing the Board of Directors of the said Miners and Farmers Bank of Aurora, Mo., have hereunto set our hands, this November 12, 1909." (Signed.)

It stands conceded that when the board of directors of defendant was in session and put their contract into typewriting and signed it, it read in that part material to the assumption as above and without the black line erasures and without the interlineation in writing appearing immediately above the typewritten words and figures, "depositors, in the sum of $40,860.17," to-wit, the words in writing, "Creditors, Excepting stockholders." We think the record sufficiently shows that after defendant's board of directors had adjourned, the memorandum evidencing the assumption was not satisfactory to the bank examiner present, and that he then caused to be called before him in the directors' room one at a time each and all of the directors either that evening or the next morning (it is likely at both

times) and that separately and individually each consented to the shown erasures and interlineation then and there made by the examiner himself.

On that state of the record defendant contends that, even if there was a liability on the part of the Merchants Bank, yet defendant is not bound on the altered assumption agreement made by the individual acts of its directors and not in an assembled board meeting. If there was an actual liability existing on the part of the Merchants Bank to plaintiff, then the contention just outlined will deserve attention; otherwise not.

Mr. Sparks, after the organization of defendant bank and after the purchase of the Merchants Bank, was for a short time its cashier. During that time he authorized plaintiff to make one charge of the accrued interest on his note to plaintiff against defendant's deposit in that bank. No authority is shown on his part to make such an order or on plaintiff to make the charge.

The record shows that plaintiff has sued the individual makers of the notes held by it as collateral security, and, as said, that it is asserting title to those notes. The details of these suits (or the suit) are unimportant.

That plaintiff has appropriated defendant's money on deposit with it as its Kansas City correspondent without defendant's consent and caused a draft drawn against that fund to be dishonored and protested also appears.

There was no attempt on the part of plaintiff to prove, as alleged in its petition, that defendant bank accepted the proceeds of any loan made by plaintiff to the Merchants Bank on or about July 9, 1909. In fact if, without lowering the dignity of our case, we may borrow the euphemism of a man once notorious in the realms of "kiting" and "high finance" in a former generation (in which he gave a flowery twist to the

phrase, "gone up the spout") we may say that all those proceeds long before defendant came into existence "had gone where the woodbine twineth."

Moreover, we do not think the record contains evidence tending to prove the averment of the petition to the effect that defendant had knowledge of the loan in suit or of the Merchants Bank's liability therefor, in fact or constructively.

Finally, it sufficiently appears that defendant dealt with the Merchants Bank in the sale and purchase on the theory that the enumerated and listed assets conveyed and transferred with the value placed upon them by the parties to the transaction, fell over $14,000 short of paying the enumerated and listed liabilities. Defendant took the note of the directors of the Merchants Bank for this shortage ostensibly secured by certain collateral belonging to it, but which was not transferred by the sale and purchase memorandum to defendant.

There is testimony somewhat accentuated by counsel, pro and con, relating to a question whether it was defendant or plaintiff who was responsible for bringing the suit or suits in the name of plaintiff on its said collateral obligations and on its note against the individual directors of the Merchants Bank, but we can make nothing of substance out of it one way or the other, and it may as well be forgotten for judicial purposes.

Defendant unsuccessfully demurred to plaintiff's case and, as said heretofore, now seeks to parry certain criticisms made on its own given instructions, and on the refusal of some instructions to plaintiff, on the theory that plaintiff made no case whatever for the jury, hence the way it was put to the jury in no event could be reversible error.

Such is the record we have to deal with under this head.

On that record we make the following observations and rulings:

(a)  The statement of facts was intentionally made full on the theory a case well stated is half decided—in this case more, much more, than half.

(b)  Taken on the pleadings and facts, this is not (as one might infer from phases of the argument of plaintiff's counsel) an action for money had and received—an action where equitable principles may be levied on to prevent what Lord MANSFIELD, I believe, once called "an unjust enrichment"—one wherein A has received money or money's worth belonging to B under such circumstances that it is against equity and good conscience for A to retain it, even absent a contract or any privity between A and B.  Therefore the doctrines of such cases as Clifford Banking Co. v. Donovan Com. Co., 195 Mo. 262; Third Nat. Bank v. St. Charles Savings Bank, 244 Mo. 554; Union Nat. Bank v. Lyons, 220 Mo. 538, do not apply.

(c)  Nor on its pleadings and facts is it a case (as one might infer from certain phases of the argument) in equity like Johnson v. United Railways Co., 247 Mo. 326, and Barrie v. United Railways Co., 138 Mo. App. 557, where (on fraud actual or constructive) such corporate transfer was made between two corporations having substantially the same directors and stockholders as resulted in the selling corporation being bereft of all debt-paying means and its creditors left in the lurch, while its stockholders were in part protected by shifts in stockholdings, and where the buying corporation was unfairly enriched by a transfer of property constituting a trust fund.  Wherefore the doctrines of those and kindred cases do not apply.

(d)  We stress the fact that the instant case is one free from fraud or mistake in, or misunderstanding of, a contract between plaintiff and the Merchants Bank. Nor is it a case holding such features on the assumption contract between the latter and defendant.  Mark, plaintiff dealt with the Merchants Bank at the outset with open eyes, deliberately.  The facts show beyond

peradventure that it intentionally loaned its money (not to the Merchants Bank, as it now asserts, but) to certain individuals procured by that bank, with plaintiff's consent, to make the loan—loaned it of set purpose on the faith and credit of such individuals and on the strength of certain securities turned over to it, and not otherwise—loaned it knowing and intending that there was to be no indebtedness created between it and the Merchants Bank. We are referred to no principle of law prohibiting that kind of loan if parties choose to make it, as here, and know of none. Not only does all the substantial evidence show the facts as stated, but when we look at what confessedly happened subsequently to the loan every lingering doubt, if any, vanishes; and to take any other view of this record would bring a blush to the judicial cheek. For example, by the most solemn and oft repeated admissions those corporate officers, who made the loan for plaintiff and who had in charge its business in due and usual course, vehemently disavowed and repudiated any liability on the part of the Merchants Bank. To that end plaintiff took steps to keep its own and the books of the Merchants Bank clear of showing such liability. Notice what happened, to-wit, thereby on this record plaintiff in its own way at first got, next mended its hold upon and now retains as in an iron fist valuable securities, once the property of the Merchants Bank and to which this defendant got no title by its purchase. Does any creditor or stockholder of the Merchants Bank or does that bank itself attack plaintiff's title to those securities on this record? No. Does anyone having a right to do so on this record attack plaintiff's title? No. Does even plaintiff repudiate its own title? No. And yet we are asked to hold that, because the money loaned as above to said individuals presently passed to the credit of the Merchants Bank, precisely as it was intended it should pass at the outset, the latter bank became indebted to plaintiff under a con-

tract as between lender and borrower, and all this in the very teeth of the understanding between the two. To do as we are asked to do means that the officers of plaintiff perpetrated a designed fraud on the banking department of this State; and it is not so clear it would not be a fraud on the Merchants Bank. We cannot very well hold that way. It seems to us it is to the interest of plaintiff and of commercial integrity and honor generally that we do not make that holding. It seems to us that justice is done by holding that plaintiff with pains made its own bed and should lie in it.

In this view of the matter, since it is not contended that an indebtedness to plaintiff was listed by the Merchants Bank or *expressly* assumed by defendant bank, and since the liability of defendant is to be got at, if at all, by classing plaintiff with "creditors" generally, we do not reach the controversy between defendant and plaintiff on the import of or on the erasures and interlineations in, the typewritten memorandum of sale and purchase. This is so because the case breaks down on the vital and primary issue raised by the pleadings, to-wit, that of an indebtedness existing between the Merchants Bank and plaintiff. If as a matter of law plaintiff made no case on that issue, then the question of assumption at once becomes immaterial. We are of opinion defendant's demurrer should have been sustained. But as that was not done and as the verdict of the jury was right, all questions relating to the way the case was put to the jury become unimportant provided plaintiff was allowed its competent evidence. [Fritz v. Railroad, 243 Mo. l. c. 68 et seq.] Moreover on this view of it, the verdict on the counterclaim was bound to be right, for all defense to the admitted conversion fails.

(e) On the question of admission of proof we see no error affecting the conclusion just announced. The court dealt liberally with plaintiff on the admission

of evidence and most of its rulings were against defendant on plaintiff's objections. For instance, on plaintiff's objection, it ruled out the resolution on August 3, 1909, of the board of directors of the Merchants Bank made, as we infer, on the suggestion of Toothaker, its own cashier; this for a reason not quite clear to us. That resolution, if it did not control, certainly bore on the issue of loan or no loan. It harked back to the original understanding and threw light thereon whether it was made at a regular or special meeting. But the question is not here to be ruled and is reserved.

Complaint is made by plaintiff of the admission in evidence of the reconcilement sheet spoken of and of the interviews in August, 1909, between the bank examiner and the officers of plaintiff. It is objected on appeal that the officers making those admissions in that interview and in the reconcilement sheet had no authority from the plaintiff to make them; that they were not part of the *res gestae* or made in due course of business, etc., hence should have been excluded. It is sufficient to say of this contention that no such objection was made below except in one instance, and in that one no exception was saved to any ruling or to the absence of a ruling, hence the point is not here.

II. The conclusion announced makes other questions unimportant, and bespeaks an affirmance. Let the judgment be affirmed. It is so ordered. *Woodson, P. J.,* and *Graves, J.,* concur; *Bond, J.,* not sitting.

## CONCURRING OPINION.

WOODSON, P. J.—I fully concur in this opinion for the reasons stated in my dissenting opinion in the case of the Third National Bank v. St. Charles Savings Bank, 244 Mo. 554. I am still of the opinion that the majority opinion in that case was fundamentally and

radically wrong, and that this case in principle clearly overrules it *in toto*.

In that case every word of the contract was in writing and was unambiguous, no doubt, as to the understanding and meaning of the parties; while in this case parts of the contract, rather some of the subsequent transactions, and conversations had between the parties regarding the contract, or loan, were oral, thereby giving some room for doubt, making a case for a jury.

This case as completely overrules the case of Third National Bank v. St. Charles Savings Bank, supra, as if it had so done in express terms.

And for this reason as previously stated I fully concur.